# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

DE SHAWN DRUMGO,                      )
                                     )
            Plaintiff,               )
                                     )
      v.                             )      C.A. No.  14-1135 GMS
                                     )
SGT. WILLIAM KUSCHEL, et al.,        )
                                     )
            Defendants.              )

## AFFIDAVIT

STATE OF DELAWARE          )
                          )  ss
COUNTY OF NEW CASTLE       )


BE IT KNOWN this __28__ day of January, 2016, personally appeared before me, the

Subscriber, a Notary Public for the State and County aforesaid, WILLIAM KUSCHEL,

personally known by me to be such and who, after being duly sworn by me according to law, did

depose and say the following:

1.      I am employed by the Delaware Department of Correction ("DDOC") and am

currently assigned to the James T. Vaughn Correctional Center ("JVTCC") facility located in

Smyrna, Delaware.

2.      I have been employed by DDOC since September, 2002 and was initially

assigned as a Correctional Officer ("C/O") to JTVCC, and have remained at that facility since

my original assignment.

3.      I was promoted to the rank of Sergeant in October, 2005.  In that capacity, my

current duties include, but are not limited to, building supervision which entails a variety of posts

or assignments.  I may be required to provide external security for the facility or the security of

the facility's gate house.  As such, my responsibilities include security checks and inspections, primarily as frisk searches, on all personnel entering the facility.  This includes both staff and visitors alike, irrespective of age or gender.

4.    The above-described frisk searches are performed in the same manner in which I was trained at the DDOC academy and is in fact the exact same search procedure that I employ within the facility since my initial date of employment.  This includes all searches of inmates, including but not limited to the Plaintiff, De Shawn Drumgo, Sr. ("Plaintiff").   The procedure that I was trained in and have continuously employed in all circumstances since the inception of my employment with DDOC is designed to quickly, efficiently and effectively detect and intercept contraband.

5.    I have read and reviewed Plaintiff's allegations in his Complaint in which he contends that I "sexually assaulted" him while conducting the same frisk search of him on the date in question as I have described above and performed countless times on staff, inmates and members of the general public alike.  To date, Plaintiff's Complaint is the only time in which I have been accused by anyone of improperly performing the frisk search or deviating from the normal manner of performing said search as I had been trained in.

6.    I categorically deny any and all allegations of wrongdoing as otherwise alleged by Plaintiff.  More specifically, I categorically deny "sexually assaulting" him.  I further deny that I either grabbed, squeezed or held onto Plaintiff's penis during the course of my frisk search of him.  Indeed, I frisk searched several other inmates who also exited the MHU 24-B chow hall (Maximum Housing Unit) at the same chow on the same date in question and in the same exact manner as I used with Plaintiff and in which I had been trained.  Not one of those other inmates complained about, filed a lawsuit or otherwise alleged that they were "sexually assaulted" by me.

7.      I further categorically deny that Plaintiff either complained about or filed a grievance alleging wrongful conduct as a result of the same frisk search procedure that I would have used during another alleged frisk search of Plaintiff supposedly occurring approximately eight months before the alleged incident made the basis of this lawsuit.

8.      In addition, I categorically deny Plaintiff's allegations that I was either called into the office of either Lieutenant Wallace or Lieutenant Schaffer to discuss alleged complaints by inmates as to the manner in which I conducted the frisk search. Nor have I ever been disciplined in any manner, either in reference to such complaints or other alleged misconduct or unprofessional behavior or performance of my duties.

9.      As for Plaintiff's allegation that I "sexually assaulted" him, I not only deny same but point to the fact that an investigation of this allegation was conducted by DDOC staff in accordance with both Federal law and Departmental policy. The investigation, known as PREA (Prison Rape Elimination Act) included, to my understanding, at least an interview of myself and Plaintiff. It is my understanding that the investigation determined that there was no merit whatsoever to Plaintiff's allegations and the matter was closed without any disciplinary action taken against me.

10.     I am also aware of statements made by Plaintiff during his deposition alleging that an altercation occurred between myself and inmate Marvin Burroughs as a result of that inmate's displeasure with a similar frisk search I conducted on that inmate. I categorically deny that such an altercation ever occurred.

11.     Further, I have no recollection of Plaintiff yelling or calling for the other staff members working the MHU 24-B chow hall at the same time and date as myself to provide him with assistance or to provide "protection" for him during my frisk search of Plaintiff. In fact, I

do recall that at that time, the other staff members were occupied themselves in the performance of their own assignments or duties as well as performing similar frisk searches of other inmates exiting the chow hall or observing and supervising the inmates in the chow hall to insure that no institutional rules were violated, no contraband was passed from one inmate to another and to maintain the security and safety of the chow hall for the sake of staff and inmates alike.  At no time did the other officers such as Co-Defendants Vangorder, Ingram, Hutchins, or Abernathy laugh at Plaintiff or refuse/fail to "protect" him as there was absolutely no reason for them to take such action.

12.     I further state that contrary to Plaintiff's allegations, the leather gloves that I employ for all frisk searches on all individuals as noted earlier are utilized to provide safety for me and to alleviate any fears of being injured during the course of frisk searches.  More specifically, due to the large size of my hands, the latex gloves usually employed by staff members prove inadequate and unsafe for me as they often split or tear while I use them.  On one occasion, they tore during a frisk search, resulting in my hand being exposed to fecal matter on the clothes of the inmate being searched.  I have also seen and heard of other staff members being cut or stabbed by contraband hidden on the person of an inmate, again exposing them to possible infection and disease such as AIDS, Hepatitis C and other similar serious or deadly communicable diseases.  Lastly, my gloves enable me to make a more thorough search of the subject in my efforts to detect potential contraband.

13.     Finally, I note for the record that as a result of conducting my frisk searches in the same thorough fashion in which I was originally trained, it has enabled me to detect, intercept and foil several attempts to spread contraband throughout the facility, thereby potentially saving

staff and inmates alike from harm while further preserving order, security and maintenance of discipline in the facility.

*William J. Kuschel, Sgt.*
WILLIAM KUSCHEL

**SWORN TO AND SUBSCRIBED** before me the day and year aforesaid.

Date: 1/28/16

NOTARY PUBLIC

Michael S. Little

Print Name

My Commission
Expires: TERM



EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

DE SHAWN DRUMGO,                    )
                                    )
                Plaintiff,          )
                                    )
        v.                          )        C.A. No.  14-1135 GMS
                                    )
SGT. WILLIAM KUSCHEL, et al.,       )
                                    )
                Defendants.         )

**<u>AFFIDAVIT</u>**

STATE OF DELAWARE        )
                         )  *ss*
COUNTY OF NEW CASTLE     )


BE IT KNOWN this __2 7__ day of January, 2016, personally appeared before me, the

Subscriber, a Notary Public for the State and County aforesaid, CHERYL VANGORDER,

personally known by me to be such and who, after being duly sworn by me according to law, did

depose and say the following:

1.      I am employed by the Delaware Department of Correction ("DDOC") and am

currently assigned to the James T. Vaughn Correctional Center ("JVTCC") facility located in

Smyrna, Delaware.

2.      I have read and reviewed the Complaint filed against myself and several other

JTVCC staff members involving a frisk search of Plaintiff on or about May 29, 2014.  In

particular, I understand that Plaintiff alleges that I deliberately directed Plaintiff to Co-Defendant

Kuschel for the frisk search because I allegedly had knowledge that Co-Defendant Kuschel had a

tendency to commit unlawful acts while conducting such searches.  I categorically deny these

allegations.  Plaintiff was directed to Co-Defendant Kuschel because he was the next available

officer able to conduct the frisk search on Plaintiff as the Plaintiff exited the chow hall.  I also

deny that I had knowledge of Co-Defendant Kuschel's alleged wrongful acts.  I further deny that

Plaintiff called for help from the other staff members, including myself, during the course of his

frisk search as conducted by Co-Defendant Kuschel.

    3.    Neither myself nor any of my fellow staff members named as Co-Defendants

were idly standing and watching Plaintiff being frisk searched.  In fact, all of us were either

engaged in conducting frisk searches of our own on other inmates or observing the activities in

the chow hall to insure that no institutional violations occurred such as passing contraband and to

insure that security, discipline and safety were maintained at all times.  Nor did I or any of my

colleagues at that time and place ever laugh at or make light of the situation as otherwise alleged

by Plaintiff.

    4.    Finally, I deny that I ever had a subsequent conversation with Plaintiff as alleged

in his Complaint or deposition in which I allegedly acknowledged that Co-Defendant Kuschel

wrongfully frisk searched Plaintiff or that Co-Defendant Kuschel had done so to other inmates in

the past.

_Chyl Van Dader_
CHERYL VANGORDER

**SWORN TO AND SUBSCRIBED** before me the day and year aforesaid.


Date: _1/27/16_


My Commission
Expires: _Team_

NOTARY PUBLIC

EXHIBIT C

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

DE SHAWN DRUMGO,               )
                               )
                Plaintiff,     )
                               )
        v.                     )        C.A. No.  14-1135 GMS
                               )
SGT. WILLIAM KUSCHEL, et al.,  )
                               )
                Defendants.    )

## AFFIDAVIT

STATE OF DELAWARE        )
                         )  ss
COUNTY OF NEW CASTLE     )


BE IT KNOWN this _____ day of January, 2016, personally appeared before me, the

Subscriber, a Notary Public for the State and County aforesaid, DANIEL HUTCHINS,

personally known by me to be such and who, after being duly sworn by me according to law, did

depose and say the following:

1.      I am employed by the Delaware Department of Correction ("DDOC") and am

currently assigned to the James T. Vaughn Correctional Center ("JVTCC") facility located in

Smyrna, Delaware.

2.      I have read and reviewed the Complaint filed against myself and several other

JTVCC staff members involving a frisk search of Plaintiff on or about May 29, 2014.   In

particular, I understand that Plaintiff alleges that I allegedly had knowledge that Co-Defendant

Kuschel had a tendency to commit unlawful acts while conducting such searches.  I categorically

deny these allegations.  I further deny that Plaintiff called for help from any of the other staff

members, including myself, during the course of his frisk search as conducted by Co-Defendant

Kuschel.

3.       Neither myself nor any of my fellow staff members named as Co-Defendants

were idly standing and watching Plaintiff being frisk searched.  In fact, all of us were either

engaged in conducting frisk searches of our own on other inmates or observing the activities in

the chow hall to insure that no institutional violations occurred such as passing contraband and to

insure that security, discipline and safety were maintained at all times.  Nor did I or any of my

colleagues at that time and place ever laugh at or make light of the situation as otherwise alleged

by Plaintiff.

4.       Finally, I deny that I ever had a conversation with Plaintiff as alleged in his

Complaint or deposition in which I acknowledged that Co-Defendant Kuschel wrongfully frisk

searched Plaintiff or that Co-Defendant Kuschel had done so to other inmates in the past.


_____

DANIEL HUTCHINS


**SWORN TO AND SUBSCRIBED** before me the day and year aforesaid.



Date: _____          _____

NOTARY PUBLIC


_____

Print Name

My Commission

Expires:_____

EXHIBIT D

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

DE SHAWN DRUMGO,                    )
                                   )
                  Plaintiff,        )
                                   )
        v.                         )        C.A. No.  14-1135 GMS
                                   )
SGT. WILLIAM KUSCHEL, et al.,       )
                                   )
                  Defendants.       )

## <u>AFFIDAVIT</u>

STATE OF DELAWARE        )
                         )  *ss*
COUNTY OF NEW CASTLE     )

BE IT KNOWN this __*27*__ day of January, 2016, personally appeared before me, the

Subscriber, a Notary Public for the State and County aforesaid, TERRELL INGRAM, personally

known by me to be such and who, after being duly sworn by me according to law, did depose

and say the following:

1.    I am employed by the Delaware Department of Correction ("DDOC") and am

currently assigned to the James T. Vaughn Correctional Center ("JVTCC") facility located in

Smyrna, Delaware.

2.    I have read and reviewed the Complaint filed against myself and several other

JTVCC staff members involving a frisk search of Plaintiff on or about May 29, 2014.  In

particular, I understand that Plaintiff alleges that I allegedly had knowledge that Co-Defendant

Kuschel had a tendency to commit unlawful acts while conducting such searches.  I categorically

deny these allegations.  I further deny that Plaintiff called for help from the other staff members,

including myself, during the course of his frisk search as conducted by Co-Defendant Kuschel.

3.     Neither myself nor any of my fellow staff members named as Co-Defendants were idly standing and watching Plaintiff being frisk searched.  In fact, all of us were either engaged in conducting frisk searches of our own on other inmates or observing the activities in the chow hall to insure that no institutional violations occurred such as passing contraband and to insure that security, discipline and safety were maintained at all times.  Nor did I or any of my colleagues at that time and place ever laugh at or make light of the situation as otherwise alleged by Plaintiff.

4.     Finally, I deny that I subsequently had a conversation with Plaintiff while escorting him to a visitation in which I confided that Co-Defendant Kuschel had improperly searched Plaintiff or that I had any prior knowledge of such behavior by Co-Defendant Kuschel with any other inmates.

_____
TERRELL INGRAM

**SWORN TO AND SUBSCRIBED** before me the day and year aforesaid.

Date: _____

_____
NOTARY PUBLIC

Michael S. Little
Print Name

My Commission
Expires: _____

EXHIBIT E

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

DE SHAWN DRUMGO,                          )
                                          )
              Plaintiff,                   )
                                          )
        v.                                 )        C.A. No.  14-1135 GMS
                                          )
SGT. WILLIAM KUSCHEL, et al.,              )
                                          )
              Defendants.                  )

## AFFIDAVIT

STATE OF DELAWARE          )
                          ) *ss*
COUNTY OF NEW CASTLE      )


BE IT KNOWN this _____ day of January, 2016, personally appeared before me, the

Subscriber, a Notary Public for the State and County aforesaid, PAUL ABERNATHY,

personally known by me to be such and who, after being duly sworn by me according to law, did

depose and say the following:

1.      I am employed by the Delaware Department of Correction ("DDOC") and am

currently assigned to the James T. Vaughn Correctional Center ("JVTCC") facility located in

Smyrna, Delaware.

2.      I have read and reviewed the Complaint filed against myself and several other

JTVCC staff members involving a frisk search of Plaintiff on or about May 29, 2014.   In

particular, I understand that Plaintiff alleges that I allegedly had knowledge that Co-Defendant

Kuschel had a tendency to commit unlawful acts while conducting such searches.  I categorically

deny these allegations.  I further deny that Plaintiff called for help from the other staff members,

including myself, during the course of his frisk search as conducted by Co-Defendant Kuschel.

3.      Neither myself nor any of my fellow staff members named as Co-Defendants were idly standing and watching Plaintiff being frisk searched.  In fact, all of us were either engaged in conducting frisk searches of our own on other inmates or observing the activities in the chow hall to insure that no institutional violations occurred such as passing contraband and to insure that security, discipline and safety were maintained at all times.  Nor did I or any of my colleagues at that time and place ever laugh at or make light of the situation as otherwise alleged by Plaintiff.

4.      Finally, I also deny the allegations in the Affidavit attached to Plaintiff's Complaint marked as page 20 stating that I was laughing during the Plaintiff's frisk search or that I had any prior knowledge of Co-Defendant Kuschel's alleged wrongful actions during the course of conducting his pat and frisk searches of inmates or anyone else.


_____
PAUL ABERNATHY


**SWORN TO AND SUBSCRIBED** before me the day and year aforesaid.


Date: _____

_____
NOTARY PUBLIC

_____
Print Name

My Commission
Expires:_____

EXHIBIT F

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

DE SHAWN DRUMGO,                          )
                                          )
            Plaintiff,                    )
                                          )
      v.                                  )        C.A. No.  14-1135 GMS
                                          )
SGT. WILLIAM KUSCHEL, et al.,             )
                                          )
            Defendants.                   )

## AFFIDAVIT

STATE OF DELAWARE          )
                           )  ss
COUNTY OF NEW CASTLE       )

BE IT KNOWN this _26th_ day of January, 2016, personally appeared before me, the

Subscriber, a Notary Public for the State and County aforesaid, STANLEY BAYNARD,

personally known by me to be such and who, after being duly sworn by me according to law, did

depose and say the following:

 1.  I am employed by the Delaware Department of Correction ("DDOC") and am

currently assigned to the James T. Vaughn Correctional Center ("JVTCC") facility located in

Smyrna, Delaware.

 2.  My current assignment is with the Internal Affairs Division at the JTVCC as an

Institutional Investigator.   In that capacity, I was assigned to perform a PREA investigation

(Prison Rape Elimination Act) of a complaint by Inmate De Shawn Drumgo, Sr. (Plaintiff")

against a Sgt. William Kuschel.  Plaintiff's complaint alleged that Sgt. Kuschel had sexually

assaulted the Plaintiff during a routine frisk search on or about May 29, 2014 as Plaintiff exited

the MHU 24-B chow hall.

3.      During the course of my investigation, I reviewed any and all applicable documents on file at JTVCC and interviewed both the Plaintiff and the alleged assailant, Sgt. Kuschel.  I followed the institutional procedures concerning the format and parameters of such an investigation.

4.      I concluded that there was no credible evidence to substantiate the claim and recommended closure of the matter without the need for further action against Sgt. Kuschel.

5.      Additionally, I have reviewed the pending Complaint filed in Federal Court alleging, *inter alia*, that Plaintiff believes I was somehow responsible for his reassignment to MHU-21 soon after the incident giving rise to the pending Complaint.  In particular, I take note of Plaintiff's allegation that I actually "ordered" the housing transfer in retaliation for another pending lawsuit filed by Plaintiff in which I am named as one of the Defendants therein.

6.      I categorically deny this allegation as well as any others asserted by Plaintiff against me in this case.  More specifically, I deny having "retaliated" in any fashion against Plaintiff for any other lawsuits in which he has named me as a Defendant.

7.      I further deny that I had any involvement whatsoever with Plaintiff's transfer. Such an action is neither within my power or the scope of my duties/responsibilities as an Institutional Investigator.

8.      Finally, I note that generally, inmates such as Plaintiff may be transferred from, one housing unit to another at any time for one of many reasons, including but not limited to, higher security setting, protective custody or a change in the inmate's Quality of Life status.  In Plaintiff's case, I am wholly unaware of the reason for the transfer at that time and despite Plaintiff's claim to the contrary, I had no involvement in said transfer.  I also note that MHU-21 and MHU-23 are essentially the same security level.

STANLEY BAYNARD

**SWORN TO AND SUBSCRIBED** before me the day and year aforesaid.

Date: 1/26/16

NOTARY PUBLIC

Michael S. Little

Print Name

My Commission
Expires: ERM

EXHIBIT G

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

DE SHAWN DRUMGO,                          )
                                          )
                 Plaintiff,               )
                                          )
        v.                                )        C.A. No.  14-1135 GMS
                                          )
SGT. WILLIAM KUSCHEL, et al.,             )
                                          )
                 Defendants.              )

## AFFIDAVIT

STATE OF DELAWARE        )
                         ) *ss*
COUNTY OF NEW CASTLE     )


        BE IT KNOWN this _____ day of January, 2016, personally appeared before me, the

Subscriber, a Notary Public for the State and County aforesaid, DAVID ALSTON, personally

known by me to be such and who, after being duly sworn by me according to law, did depose

and say the following:

        1.      I am employed by the Delaware Department of Correction ("DDOC") and am

currently assigned to the Baylor Women's Correctional Institution ("BWCI") located in New

Castle, Delaware but was assigned to JTVCC at the time of the alleged incident.

        2.      I have read and reviewed Plaintiff's Complaint and the allegations set forth

therein, particularly as to myself.  I categorically deny said allegations in their entirety.

        3.      After Plaintiff was transferred to MHU-21 and found the electric switch to be

defective, he became verbally abusive, using profanity and demanding that I "turn on the

electricity."  I told Plaintiff that if the switch was defective, I would submit a Work Order for the

facility's maintenance crew to repair it but indicated that I had neither "turned it off" nor was I able to fix it myself and thus unable to merely turn it back on.

4.      Finally, I categorically deny making the statements attributed to me by Plaintiff.  I never suggested or stated that the inoperative switch was retaliation for Plaintiff's allegations against Co-Defendant Kuschel or any of the other Co-Defendants.  I only told him that the switch in question was apparently defective and in need of repairs which I would attempt to obtain for him through the placement of a Work Order.

5.      As for the allegations made by inmate Howard Blancfield, I deny them as well.  I also deny any involvement in or direct knowledge of any of the allegations concerning Plaintiff's frisk search on or about May 29, 2014.


_____

DAVID ALSTON



**SWORN TO AND SUBSCRIBED** before me the day and year aforesaid.



Date: _____

_____

NOTARY PUBLIC

_____

Print Name

My Commission
Expires:_____

EXHIBIT H

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

DE SHAWN DRUMGO,                    )
                                   )
            Plaintiff,             )
                                   )
      v.                           )        C.A. No.  14-1135 GMS
                                   )
SGT. WILLIAM KUSCHEL, et al.,      )
                                   )
            Defendants.            )

## AFFIDAVIT

STATE OF DELAWARE        )
                         )  *ss*
COUNTY OF NEW CASTLE     )


BE IT KNOWN this ___29th___ day of January, 2016, personally appeared before me, the

Subscriber, a Notary Public for the State and County aforesaid, MICHAEL LITTLE, personally

known by me to be such and who, after being duly sworn by me according to law, did depose

and say the following:

1.      I am an employee of the Delaware Department of Correction ("DDOC") and am

currently assigned to the James T. Vaughn Correctional Center ("JVTCC") facility located in

Smyrna, Delaware.  My current position is that of Legal Services Administrator which I have

held since 2002.  Prior to assuming the position, I was a Correctional Officer for DDOC, having

been trained at and a graduate of the academy.  Accordingly, I have been trained in and am

familiar with the various rules and procedures governing both staff and the inmate population

alike.

2.      I am currently designated as the Legal Services Administrator for the facility,

with primary responsibility for supervising the facility's law library, supervising the paralegals

as they assist inmates utilizing the law library, and acting as liaison between the facility and the Delaware Department of Justice ("DDOJ").   In the latter role, I facilitate review/recovery of documents for the DDOJ, coordinate contact between staff and the DDOJ and assist with litigation matters in which DDOJ provides legal representation for staff.

3.      In that capacity, I was asked by defense counsel in the above-captioned matter to review the JTVCC computer database to determine what, if any, grievances had been filed by the above-named Plaintiff regarding any complaints as to Sgt. William Kuschel and any alleged interaction with Plaintiff during the year immediately preceding the alleged May 29, 2014 incident made the primary basis for the instant case.

4.      My review of the facility's computer databases also involved contacting the facility's grievance officer to insure the completeness of my review and data search.

5.      As a result of said search, I was unable to discover any prior grievances of a similar nature made by Plaintiff against Sgt. Kuschel despite Plaintiff's deposition testimony to the contrary.  I note that in that time period, I found over 150 grievances filed by Plaintiff that appeared to be staff and institution related issues but none of them involved allegations or complaints against Sgt. Kuschel.

6.      In addition, I found no evidence that the Plaintiff filed or pursued a grievance against Defendant Kuschel on or about May 29, 2014 pursuant to the requirements  under both Bureau of Prisons ("BOP") 4.4 and the JTVCC institutional SOP  4.4

7.      Lastly, I reviewed the housing assignments for the Plaintiff subsequent to the alleged May 29, 2014 incident and discovered that he was transferred from MHU Building 23 to MHU Building 21 on  June 6, 2014.

MICHAEL LITTLE

**SWORN TO AND SUBSCRIBED** before me the day and year aforesaid.

Date: _1/29/16_

NOTARY PUBLIC

_Maria V. Lyons_

Print Name

My Commission
Expires: _upon Office_

EXHIBIT I

210 Fed.Appx. 152
This case was not selected for
publication in West's Federal Reporter.
See Fed. Rule of Appellate Procedure 32.1 generally
governing citation of judicial decisions issued
on or after Jan. 1, 2007. See also U.S.Ct. of
Appeals 3rd Cir. App. I, IOP 5.1, 5.3, and 5.7.
United States Court of Appeals,
Third Circuit.

Carl M. SMITH, Appellant

v.

Peter VIDONISH, Unit Manager; Paul J. Stowitzsky,
Deputy Super; Dean Geehring, Mail Room
Supervisor; Jean W. Scott, Business Manager;
Conner Blaine, Jr., Superintendent; Robert S.
Bitner, Chief Hearing Examiner; Morris Harper,
Doctor; Stanley Falor, Doctor; Linda Enyeart,
EMSA Administrator; Charles Rossi, Health Care
Administrator; John J. Miller, Major, Deputy
Superintendent; Sharon L. D'Eletto, Grievance
Coordinator; Gabriella Congelio, Parole Agent;
Rammona Kulat, Commissary; William Stickman;
Mailroom Inspector 1; Mailroom Inspector 2;
Mailroom Inspector 3; Mailroom Inspector
4; Mailroom Inspector 5; Brian Hyde; Praful
Vora; (RN) High; Leggett, Corrections Officer;
Hollingsworth, Corrections Officer; Thomas L.
James, Chief Grievance Coordinator; Jean N. Scott,
Business Manager; Jeffrey A. Beard, Secretary.

No. 04–4131.
|
Submitted Under Third Circuit
LAR 34.1(a) June 22, 2006.
|
Filed: Nov. 8, 2006.

**Synopsis**
**Background:** State inmate brought pro se civil rights action
for declaratory, injunctive, and compensatory relief, alleging,
inter alia, that he was denied adequate medical care for his
cardiac conditions in violation of Eighth Amendment, that
he was placed in administrative custody in retaliation for
filing prior lawsuit and complaining about prison conditions,
that he was subjected to harassing cell searches, that he was
unlawfully forced to pay for razors at commissary, and that

his medical complaints and other grievances were handled
improperly. The United States District Court for the Western
District of Pennsylvania, Maurice B. Cohill, Jr., J., granted
summary judgment for defendants. Inmate appealed.

**Holdings:** The Court of Appeals held that:

[1] denial of inmate's motions to recuse magistrate judge
assigned to his case was not abuse of discretion;

[2] prison officials did not act with deliberate indifference
to inmate's serious medical needs related to his cardiac
conditions; and

[3] inmate failed to exhaust administrative remedies for
remaining claims.

Affirmed.

West Headnotes (3)

**[1]**   **United States Magistrate Judges**
    ⊸ Bias; recusal

Denial of state inmate's motions to recuse
magistrate judge assigned to his civil rights
case was not abuse of discretion, in that
neither inmate's bald assertion that magistrate
judge had law practice with one defendant's
brother nor magistrate judge's administrative
order requiring inmate to provide additional
copies of complaint showed a bent of mind
that could prevent or impede impartiality of
judgment or support finding of personal bias
or prejudice, and there was nothing in the
record suggesting a deep-seated and unequivocal
antagonism by magistrate judge that would
preclude fair judgment or permit reasonable
person to conclude that magistrate judge's
impartiality could reasonably be questioned. 28
U.S.C.A. §§ 144, 455.

4 Cases that cite this headnote

**[2]**   **Prisons**

☞ Particular Conditions and Treatments

**Sentencing and Punishment**
☞ Medical care and treatment

Prison officials did not act with deliberate indifference to state inmate's serious medical needs related to his cardiac conditions, and thus did not violate his Eighth Amendment rights, even if inmate was not satisfied with his cardiac care; inmate was examined during multitude of sick call visits in prison medical department and referred to cardiologist at hospital, inmate received medications and extensive medical testing, including 24 electrocardiograms (EKGs), a Holter monitor, stress testing, chest x-rays, and other imaging tests, and inmate received follow-up care with respect to testing that yielded abnormal results. U.S.C.A. Const.Amend. 8.

Cases that cite this headnote

[3]   **Civil Rights**
☞ Criminal law enforcement; prisons

State inmate pursuing pro se civil rights action did not satisfy provision of Prison Litigation Reform Act (PLRA) requiring exhaustion of administrative remedies for claims challenging conditions of confinement, given that inmate filed only two grievances during relevant period and conceded that he did not fully exhaust one of those grievances, and that inmate, contrary to his contention, was not prevented from exhausting claims in second grievance when that grievance was rejected for noncompliance with prison grievance procedure, with instructions to submit edited grievance if inmate believed rejection was in error. Prison Litigation Reform Act of 1995, § 101(a), 42 U.S.C.A. § 1997e(a).

3 Cases that cite this headnote

**\*153** On Appeal from the United States District Court For the Western District of Pennsylvania (D.C. Civ. No. 01–cv–02039), District Judge: Honorable Maurice B. Cohill, Jr.

**Attorneys and Law Firms**

Carl M. Smith, Waynesburg, PA, pro se.

Mary L. Friedline, Rodney M. Torbic, Office of Attorney General of Pennsylvania, Pittsburgh, PA, A. Tracey Campbell, White & Williams, Berwyn, PA, for Peter Vidonish, Unit Manager; Paul J. Stowitzsky, Deputy Super; Dean Geehring, Mail Room Supervisor; Jean W. Scott, Business Manager; Conner Blaine, Jr., Superintendent; Robert S. Bitner, Chief Hearing Examiner; Morris Harper, Doctor; Stanley Falor, Doctor; Linda Enyeart, EMSA Administrator; Charles Rossi, Health Care Administrator; John J. Miller, Major, Deputy Superintendent; Sharon L. D'Eletto, Grievance Coordinator; Gabriella Congelio, Parole Agent; Rammona Kulat, Commissary; William Stickman; Mailroom Inspector 1; Mailroom Inspector 2; Mailroom Inspector 3; Mailroom Inspector 4; Mailroom Inspector 5; Brian Hyde; Praful Vora; (RN) High; Leggett, Corrections Officer; Hollingsworth, Corrections Officer; Thomas L. James, Chief Grievance Coordinator; Jean N. Scott, Business Manager; Jeffrey A. Beard, Secretary.

BEFORE: McKEE, FUENTES and NYGAARD, Circuit Judges.

**OPINION**

PER CURIAM.

**\*\*1** Carl M. Smith appeals from the order of the United States District Court for the Western District of Pennsylvania granting summary judgment in favor of the defendants. Smith also appeals the orders denying **\*154** his motions to disqualify the Magistrate Judge assigned to his case. We will affirm.

**I.** *Relevant History*

Because the parties are familiar with this case's history, we will not recount the background at length. Smith, a state prisoner, filed a *pro se* civil rights action regarding events while he was incarcerated at SCI–Greene (Waynesburg, Pennsylvania). In his amended complaint, Smith alleged that he was denied adequate medical care for his cardiac condition, and that the defendants' conduct displays deliberate indifference to his serious medical need, in violation of the Eighth Amendment. Smith also alleged numerous other claims, including that the defendants (1) placed him

Smith v. Vidonish, 210 Fed.Appx. 152 (2006)

in administrative custody in retaliation for the filing of a previous lawsuit and for complaints he made about prison conditions at SCI–Pittsburgh; (2) subjected him to harassing cell searches and made an unfavorable parole recommendation; (3) confiscated his legal mail and failed to investigate his complaint regarding interference with his mail; (4) unlawfully forced him to pay for razors at the commissary; and (5) failed to handle his medical complaints and other grievances properly. Smith sought declaratory, injunctive, and damages relief.

During the proceedings, Smith filed motions to disqualify the Magistrate Judge assigned to the case. The Magistrate Judge denied the motion, and the District Court also denied relief. The defendants filed motions to dismiss or, in the alternative, for summary judgment. Smith filed responses. The Magistrate Judge recommended that summary judgment be granted, concluding that Smith failed as a matter of law to demonstrate an Eighth Amendment violation on his medical claims, and that Smith failed to exhaust his administrative remedies, as required by 42 U.S.C. § 1997e(a), on his remaining claims. Smith filed his objections to the report and recommendation.[1] The District Court adopted the report and recommendation and granted the motions for summary judgment.[2] Smith appeals. We have jurisdiction under 28 U.S.C. § 1291.

## II. *Motions to Disqualify the Magistrate Judge*

[1]    Smith contends that the District Court erred in failing to disqualify the Magistrate Judge. We review decisions not to recuse, under either 28 U.S.C. § 144 or § 455, for an abuse of discretion. *See Jones v. Pittsburgh Nat'l. Corp.,* 899 F.2d 1350, 1356 (3d Cir.1990). Under section 144, a judge must recuse if a party files a "sufficient affidavit" establishing that the judge has a personal bias or prejudice against the party seeking recusal, or in favor of the adverse party. 28 U.S.C. § 144. Under section 455, a judge must recuse where the judge's impartiality **155 "might reasonably be questioned," or where the judge has "a personal bias or prejudice concerning a party." 28 U.S.C. § 455(a), (b)(1).

**2    Smith contends that the Magistrate Judge was biased against him for assorted reasons. Chiefly, Smith's argument is based on his belief that the Magistrate Judge's brother has a law practice with defendant Falor's brother. Smith also asserts that the judge exhibited bias in a March 2003 administrative order requiring him to submit fourteen copies of the complaint, when he had already provided the copies when

submitting his complaint in 2001.[3] We are unpersuaded by these arguments. First, Smith's assertions regarding an alleged personal connection between the Magistrate Judge and defendant Falor were devoid of detail and stated in conclusory fashion. Smith's bare allegations in support of his recusal motion rested on the similarly bare allegation that a fellow inmate, Michael Malik Allah, told him about the recusal issue. Citing section 144 and *United States v. Vespe,* 868 F.2d 1328 (3d Cir.1989), Smith appears to argue that the factual allegations in his declaration submitted in support of his first recusal motion must be accepted as true. However, section 144 requires a "sufficient" affidavit, and conclusory statements need not be credited. 28 U.S.C. § 144; *Vespe,* 868 F.2d at 1340. Neither the bald allegations regarding "the brothers" nor the Magistrate Judge's order regarding photocopies supports a "bent of mind that may prevent or impede impartiality of judgment," *United States v. Vespe,* 868 F.2d 1328, 1340 (3d Cir.1989) (discussing section 144), or a finding of personal bias or prejudice, *Edelstein v. Wilentz,* 812 F.2d 128, 130–31 (3d Cir.1987) (discussing section 455(b)(1)). We find nothing in the record that suggests "a deep-seated and unequivocal antagonism" by the Magistrate Judge that would preclude fair judgment. *Liteky v. United States,* 510 U.S. 540, 556, 114 S.Ct. 1147, 127 L.Ed.2d 474 (1994) (trial administration efforts did not constitute sufficient grounds for recusal). Nor do we perceive any facts from which a reasonable person would conclude that the impartiality of the Magistrate Judge might reasonably be questioned. *See* 28 U.S.C. § 455(a); *Edelstein,* 812 F.2d at 131. We discern no abuse of discretion in the denial of Smith's recusal motions.

## III. *Motions for Summary Judgment*

We exercise plenary review over a District Court's grant of summary judgment and apply the same test applied by the District Court. *Saldana v. Kmart Corp.,* 260 F.3d 228, 231 (3d Cir.2001). Summary judgment is proper when, viewing the evidence in the light most favorable to the nonmovant, there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Id.* at 232; Fed.R.Civ.P. 56(c). If the moving party meets the initial burden of establishing that there is no genuine issue, the burden shifts to the nonmoving party to produce evidence of a genuine issue for trial. Specifically, the party opposing summary judgment "may not rest upon the mere allegations or denials of the ... pleading"; the party's response, "by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." *Saldana,*

Smith v. Vidonish, 210 Fed.Appx. 152 (2006)

260 F.3d at 232 (citing Fed.R.Civ.P. 56(e); **156** *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). *See also Fireman's Ins. Co. v. DuFresne,* 676 F.2d 965, 969 (3d Cir.1982) ( Fed.R.Civ.P. 56(e) does not allow a party opposing summary judgment to rely merely upon bare assertions, conclusory allegations, or suspicions).

### A. *Smith's Medical Claims*

**\*\*3** [2] To prevail on an Eighth Amendment claim based on medical treatment while in prison, a prisoner must show that prison officials were deliberately indifferent to his or her serious medical needs. *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). The alleged violation must be beyond mere negligence. *Durmer v. O'Carroll,* 991 F.2d 64, 67 (3d Cir.1993). Smith's arguments focus upon whether the conduct of the defendants amounted to deliberate indifference. We have found deliberate indifference where a prison official: (1) knows of a prisoner's need for medical treatment but intentionally refuses to provide it; (2) delays necessary medical treatment for non-medical reasons; or (3) prevents a prisoner from receiving needed or recommended treatment. *See Rouse v. Plantier,* 182 F.3d 192, 197 (3d Cir.1999).

The prison medical director's affidavit in support of summary judgment summarizes the care administered to Smith for his cardiac conditions. For example, Smith was examined during a multitude of sick call visits in the prison medical department and was referred to a cardiologist at the hospital. He also received medications and extensive medical testing, including twenty-four EKGs, a Holter monitor, stress testing, chest x-rays, and other imaging tests. Some of the testing yielded abnormal results, to which the medical defendants responded with follow-up care but concluded that no serious problem exists. We agree with the District Court that the abundant and responsive medical care provided by the defendants belies Smith's assertions that the defendants acted with deliberate indifference. That Smith is not satisfied with his cardiac care does not suffice for stating a claim of deliberate indifference, even if he believes the treatment may be negligent. *See Estelle,* 429 U.S. at 105–07, 97 S.Ct. 285.

### B. *Smith's Non–Medical Claims*

[3] Lastly, we consider Smith's remaining non-medical claims determined to be administratively unexhausted. Under the Prison Litigation Reform Act ("PLRA"), exhaustion of administrative remedies is required for all actions concerning prison conditions brought under federal law. 42 U.S.C. § 1997e(a); *Spruill v. Gillis,* 372 F.3d 218, 227 (3d Cir.2004). In *Spruill,* we held that the PLRA required "proper" exhaustion, meaning that the inmate must follow the procedural requirements of the prison grievance system. *Spruill,* 372 F.3d at 228, 231. If the prisoner fails to follow the procedural requirements, then his claims are procedurally defaulted. The prison grievance procedure in this case, known as DC–ADM 804, provides a three-part review: (1) the prisoner must file a grievance within fifteen days with the grievance coordinator; (2) the prisoner may appeal to the facility manager within five days of receipt of the initial review; and(3) the prisoner may appeal to the Central Office Review Committee.

In Smith's case, the defendants submitted an affidavit by the prison grievance coordinator stating that Smith only filed two grievances, Nos. GRN–1163–2000 and GRN–0834–2001, regarding non-medical prison conditions during the relevant period. Smith concedes that he did not fully exhaust his grievance in GRN–1163–2000. He does not argue that he pursued any other grievances. He also appears to concede that he did not complete all levels of **\*157** the grievance process regarding GRN–0834–2001. Instead, Smith asserts that he was prevented from exhausting his claims presented in GRN–0834–2001 when the grievance was rejected from consideration by the prison. Smith cites (*Brown v. Croak,* 312 F.3d 109 (3d Cir.2002), and appears to argue that he could not exhaust his claims presented in GRN–0834–2001 because the grievance procedures were not "available" within the meaning of section 1997e(a)). We are unpersuaded. Unlike in *Brown,* Smith was not instructed by prison authorities not to file his grievance. Rather, Smith filed his grievance and obtained a rejection for non-compliance with DC–ADM 804, with the instruction to submit an edited grievance if he believed the rejection was in error. We find no error in the District Court's conclusion that Smith's remaining claims are administratively unexhausted.

### IV. *Conclusion*

**\*\*4** We have considered all of the arguments raised in Smith's briefs and find them to be without merit. To the extent that Smith attempts to raise new claims for relief against the defendants and against others who are not parties to this matter, we will not address them, as they are not properly before us. We will affirm the District Court's judgment.

**Smith v. Vidonish, 210 Fed.Appx. 152 (2006)**

---

**All Citations**

210 Fed.Appx. 152, 2006 WL 3227859

Footnotes

1      In his brief, Smith alleges that he was deprived of his constitutional right of access to the courts, contending that the Clerk of the District Court refused to file or docket his responses to the motions for summary judgment and objections to the Magistrate Judge's report and recommendation. He further alleges that the Clerk arbitrarily disposed of his legal materials as part of a cover-up and conspiracy. Now, on appeal, Smith seeks to amend his complaint to add the Clerk as a defendant and add this new claim. Aside from the principle that this new claim is not properly before this Court on appeal, we note that Smith's responses to the motions for summary judgment and objections to the report and recommendation appear on the docket and were duly filed on August 9, 2004 and September 22, 2004.

2      The Magistrate Judge also recommended dismissal of unserved defendants, and the District Court dismissed those defendants for lack of service. Smith does not challenge this aspect of the District Court's order.

3      Smith initially attempted to file his complaint with in forma pauperis status, but in forma pauperis status was denied because he had already incurred "three strikes." See 28 U.S.C. § 1915(g). After an unsuccessful appeal on that issue, Smith paid the filing fee. The Magistrate Judge then issued the order requiring the additional photocopies.

---

**End of Document**                                             © 2016 Thomson Reuters. No claim to original U.S. Government Works.

EXHIBIT J

|  | STANDARD OPERATING PROCEDURES<br><br>James T. Vaughn Correctional Center | NUMBER<br>4.4 | PAGE<br>Page 1 of 6 |
|---|---|---|---|
| | | INMATE GRIEVANCE PROCEDURES | |

**RESTRICTED**
AUTHORIZED FOR RELEASE TO DEPARTMENT OF CORRECTION PERSONNEL AND THROUGH LAW LIBRARIES TO INMATES

EFFECTIVE: June 10, 2013

SUMMARY of REVISION/REVIEW

This document is a complete re-write which supersedes and replaces all previous editions

APPROVED:

Perry Phelps, Warden
James T. Vaughn Correctional Center

I. **AUTHORITY**: Department of Correction policy 4.4 and Bureau of Prison procedure 4.4.

II. **RELATED STANDARD**: ACA Standard 4-4284, 4-4344, and 4-4394.

III. **PURPOSE**: To establish guidelines in which inmates can express concerns through a formalized grievance process.

IV. **APPLICABILITY:** To all James T. Vaughn Correctional Center (JTVCC) employees, volunteers and all inmates at JTVCC. To all persons or organizations conducting business at JTVCC.

V. **POLICY:** It is the policy of James T. Vaughn Correctional Center to provide a formal complaint process through grievances which allow for informal and formal resolutions of their concerns.

VI. **PROCEDURE:** Copies of the Inmate grievance Policy will be available to inmates in each facility.

    A. General Rules:

        1. The Warden and/or designee will:

            a) Coordinate with the Bureau Chief of Prisons to provide initial training and refresher training for staff members as necessary.

            b) Provide periodic training to inmates as necessary.

            c) Distribute policy to staff and inmates.

        2. Inmates will be entitled to file a grievance. Inmate complaints regarding policies and conditions must be within Department of Correction (DOC) jurisdiction. This includes actions by employees, inmates, and incidents occurring within the facility that personally affect the inmate.

        3. Inmates may withdraw a grievance during the process by providing the Inmate Grievance Chairperson (IGC) written notice.



| STANDARD OPERATING PROCEDURES  James T. Vaughn Correctional Center | NUMBER  4.4 | PAGE  Page 2 of 6 |
|---|---|---|
| | INMATE GRIEVANCE PROCEDURES | |

4. Policies that have their own formal appeal mechanisms are not grievable under this policy. Inmates must address appeals on these concerns as directed in each specific policy.

5. Inmates seeking an appeal of court ordered sentencing, credit for time served, or other conflicts regarding sentencing order intent must address those concerns directly with the sentencing judge. The IGC will return the grievance with guidance to write the appropriate Court or Central Offender Records.

6. Inmates will be afforded a meaningful, understandable answer to the administrative remedy requested. Relief may include adjustment to an objectionable condition of confinement, institutional procedure or practice, or restitution.

7. The maximum period between initial grievance receipt and Bureau Chief final decision will not exceed 180 days. Remedies which are dependent on state agencies or departments outside of the DOC may require more time to coordinate their activities. The IGC is responsible for monitoring the grievance's progress.

8. This policy prohibits reprisal against inmates or staff for using or participating in the grievance process. If participants experience retaliatory acts, they may appeal directly to the facility Warden. The Warden will respond in writing within ten days of receipt of the appeal. The Warden's decision is appealable to the Bureau Chief for final disposition.

9. Grievances will be kept separate from the inmate's master file. Staff and inmates will not have access to records except to the extent necessary for clerical processing, grievance resolution, or compliance monitoring.

10. Inmates are prohibited from submitting more than one grievance arising from the same concern. Inmate should only submit one concern per grievance form. Grievances may be returned unprocessed for vulgar, abusive or threatening language, expired filing period, if they are requests, and if they are inquiries on behalf of other inmates.

11. If more than one inmate files a grievance on the same concern, the IGC may consolidate the grievances into a single group grievance and identify an inmate to be the representative inmate for that group. The IGC will notify individuals involved and make note in associated grievance response forms.

12. The Resident Grievance Committee (RGC) will be comprised of two inmates, elected by a majority vote from their own housing unit, and two staff designated by the facility Warden. Staff designated should include custody and treatment staff, as well as, those who have frequent contact with the housing units. Each RGC member has one vote; the IGC will only vote to break a tie.



| STANDARD OPERATING PROCEDURES<br>James T. Vaughn Correctional Center | NUMBER<br>4.4 | PAGE<br>Page 3 of 6 |
|---|---|---|
| | INMATE GRIEVANCE PROCEDURES | |

13. Two inmates and two alternate inmate RGC members will serve for a term of six months. Staff RGC members will serve at the discretion of the facility Warden and/or designee. RGC members will be represented by at least one security and one represented by treatment.

B. Non-Emergency Grievance Resolution Steps:

1. Step One: The inmate must complete the grievance form within seven days following the concern and submit the completed form into a secure drop-box location which is collected by staff members assigned to the grievance office. Submitted forms will be processed into the Delaware Automated Correction System (DACS) for tracking within seven days. After processing by the IGC, grievances will be forwarded within seven days to facility personnel for investigation or resolution.

   a) IGC will provide the inmate with a copy of the grievance documenting whether the grievance was rejected or will be forwarded for investigation within seven days.

   b) In the event the grievance relates to the conduct of a staff member, the grievance will be rejected and forwarded to the individual's immediate supervisor for investigation. Inmates or employees named as a party to the grievance will not participate in any capacity in the resolution process. This includes making contact for information gathering not just decision-making. Grievances filed against the IGC or appealing authority will be reviewed by the next higher authority.

   c) Facility personnel who receive notification from the IGC of grievances have fourteen days to respond to the material contained in grievances. Responses to grievances will contain relevant information as to why grievances should be denied or accepted and document any investigative findings in the DACS grievance module.

   d) Acceptance of the informal resolution will result in the grievance being annotated in DACS as closed. Grievance staff will monitor for resolution compliance.

   e) Unresolved grievances will be referred to step two.

2. Step Two: RGC/Subject Matter Expert (SME) Panel Recommendation and Warden's Decision

   a) The IGC will provide written notification to the inmate when the RGC or SME hearing will be held. SME are assigned staff which include but are not limited to Inmate Healthcare services, Facility Maintenance, Food Service, Records, and Inmate Phone services. This hearing notice will be sent within seven days of the IGC's receipt of the rejected informal resolution.

   b) The RGC or SME panel will convene within thirty days of the IGC's receipt of the grievance to examine the concern and document investigative data, hear testimony, and make a recommendation.



| STANDARD OPERATING PROCEDURES  James T. Vaughn Correctional Center | NUMBER 4.4 | PAGE Page 4 of 6 |
|---|---|---|
| | INMATE GRIEVANCE PROCEDURES | |

    c) If the following SME panels are assembled, they will be comprised of:

        1) Maintenance – Maintenance Superintendent and one maintenance officer.

        2) Food Service – Food Service Director and one Food Service officer.

        3) Records – Records Manager and one Record staff member.

    d) If a full RGC panel cannot be convened as scheduled, the inmate may elect to have the grievance heard, by the committee members assembled, or have the hearing rescheduled.

    e) The RGC or SME panel may ask questions they feel are relevant to the issue grieved. If the panel determines further investigation is required to render a recommendation the hearing may be postponed for an additional fourteen days, by majority panel vote and inmate consent. The additional time option, justification, and inmate consent must be documented in the DACS grievance module.

    f) Inmates will provide available supporting evidence to the hearing panel for consideration. Evidence purposely withheld from the panel will not be eligible for insertion into the grievance at a later date. This may result in a finding that the Inmate has abandoned the grievance.

    g) The RGC or SME panel recommendations will be electronically documented in DACS by the IGC and forwarded to the Warden and/or designee or Bureau level SME within three days.

    h) The Warden and/or designee or Bureau level SME will make a decision within fourteen days of receipt and forward to the IGC. Decision options include but are not limited to:

        1) Directing additional investigation.

        2) Uphold or denying the inmate's remedy requested.

        3) Making partial accommodations.

    i) The IGC will notify the inmate of the decision and supporting rationale within seven days of receipt.

        1) If the inmate accepts the decision, the grievance will be electronically closed by the IGC and listed as "Resolved" in DACS. Grievance staff will monitor for resolution compliance.



| STANDARD OPERATING PROCEDURES<br><br>James T. Vaughn Correctional Center | NUMBER<br>4.4 | PAGE<br>Page 5 of 6 |
|---|---|---|
| | INMATE GRIEVANCE PROCEDURES | |

2) If the inmate rejects the decision, a written grievance appeal form will be submitted to the IGC within fourteen days. Failure to submit the appeal within this timeframe will be interpreted as an abandonment of the grievance and the inmates acceptance of the decision.

3) When receiving the completed grievance appeal form the IGC will enter the appeal into DACS and electronically forward the grievance to the Bureau Grievance Officer (BGO) within seven days. The IGC will provide written notification within seven days to the inmate that the appeal was received and forwarded to the BGO.

3. Step Three: Bureau Chief Decision and Grievance Resolution

   a) Within seven days of the receipt of the appealed grievance the BGO will make an electronic recommendation to the Bureau Chief.

   b) These recommendations can include but are not limited to:

      1) Directing additional investigation.

      2) Uphold or deny the inmate's remedy requested.

      3) Making a partial accommodation.

      4) Outside review.

   c) The Bureau Chief may accept or reject the BGO recommendation and annotate the decision in DACS within seven days.

   d) If the Bureau Chief opts for an outside review the hearing will occur within seven days of the reviewer's receipt of the grievance materials. Outside reviewers, who are individuals not associated with the Department of Corrections, will issue written recommendations with supporting rationale to the Bureau Chief within seven days of the hearing. The Bureau Chief will accept or reject the outside reviewer's recommendation in DACS within seven days of receipt.

   e) The Bureau Chief's decision is final and not open to further debate or appeal. The Bureau Chief's decision letter to the inmate will state that the inmate has fully exhausted every available administrative remedy.

C. Emergency Grievance Resolution:

1. The IGC will expedite and forward emergency grievances which under regular policy time limits would subject the inmate to substantial risk of personal, physical, or psychological harm to the Warden and/or designee or Bureau level SME. The Warden and/or designee or Bureau level SME will determine if the grievance qualifies as an emergency. If the grievance qualifies the Warden and/or designee or Bureau level SME will provide a solution and respond in DACS within twenty four hours of receipt.



| STANDARD OPERATING PROCEDURES  James T. Vaughn Correctional Center | NUMBER 4.4 | PAGE Page 6 of 6 |
|---|---|---|
| | INMATE GRIEVANCE PROCEDURES | |

    a)  If the inmate accepts the decision the grievance will be closed by the IGC and the status marked resolved. Grievance staff will monitor for resolution compliance.

    b)  If the inmate rejects the decision, a written grievance appeal form will be submitted to the IGC within twenty four hours of decision receipt to be forwarded to the Bureau Chief. Failure to appeal will be considered abandonment of the grievance and the Inmates acceptance of the decision.

    c)  The Bureau Chief will make a decision on the emergency grievance appeal within twenty four hours of receipt of the appeal in DACS.

  2.  If the Warden and/or designee or the Bureau level SME determines the grievance is not an emergency, the grievance will be returned to the IGC. The IGC will notify the inmate that the grievance is not an emergency and will proceed processing as a regular grievance.

D.  Medical Grievance Resolution:

  1.  Inmates will submit a completed medical grievance form to the IGC for electronic entry into DACS.

  2.  The IGC will be responsible for scheduling grievance hearings at the facility.

  3.  Specific instructions and time guidelines for medical grievances are addressed in BCHS Policy A-11 Grievance Mechanism.

**This procedure is subject to change at the discretion of the Warden.**

Inmates should attempt to resolve complaints prior to filing a regular grievance. Grievances are to be submitted within seven (7) days from the date of the occurrence or incident, or within seven (7) days after the inmate became aware of the incident. Only one issue per grievance form will be addressed. If the grievance is submitted on a weekend or a holiday, it will be received for processing the next working day.

Returned/Unprocessed Grievance:

- ☐ **Vulgar/Abusive or Threatening Language.** The Language that is unacceptable has been highlighted. The Grievance may be resubmitted omitting this language.
- ☐ **Disciplinary Action.** Appeals of disciplinary actions shall be sent to the Hearing Officer within 72 hr. of the offender's receipt of the hearing's written record. Refer to BOP Policy 4.2 "Rules of Conduct" on how to appeal. Disciplinary # [_____]
- ☐ **Parole Decision.** Decisions of the Parole Board should be directed to the Board of Parole by writing their office at: Carvel State Office Building- Fifth Floor

  820 North French Street
  Wilmington, DE 19801
- ☐ **Classification Action.** Written appeals must be submitted within 10-days of receipt of the decision of the committee/board. IBCC decisions shall be directed to the facility Warden/designee, CICB decisions shall be directed to the Classification Administrator. Refer to BOP Policy 3.3 "Classification" on how to appeal.
- ☐ **Prohibited Mail.** Written appeals on prohibited mail shall be directed to the facility Warden. Refer to BOP Policy 8.92 "Mailroom Operations" on how to appeal.
- ☐ **Request.** Requests are not processed through the grievance procedure. Please correspond with the appropriate office to secure the information that is requested.
- ☐ **Duplicate Grievance(s).** This issue has been addresses previously in Grievance # [_____]
- ☐ **Original Grievance** must be submitted to the Inmate Grievance Chairperson. Photocopies are not accepted.
- ☐ **Inquiry on behalf of other Inmates.** Inmates cannot submit grievances for other Inmates.
- ☐ **Expired Filing period.** Grievance exceeds seven (7) days from date of occurrence.
- ☐ **Staff Investigation.** To request that the actions of security staff be investigated write to your Area Supervisor/Unit Commander with that request. If you receive no response or are dissatisfied with the response, you may appeal that decision to the Security Superintendent and ultimately to the Warden.

☐ **Other.** [_____]

<u>GRIEVANCE APPEAL FORM</u>

This must be completed and returned to the IGC, via the Grievance Box, No Later than Due Date to appeal the Warden/Designee/BSME Decision/MGC. Please specify the reason for the appeal I the space below. If you decide not to appeal the decision you must so indicate with the statement "I do not wish to appeal". Appeal must be returned via the Grievance Box. If you need additional space, attach 8.5" x 11" size sheets of paper. Failure to reply by the due date will result in the grievance being considered resolved.

GRIEVANT'S NAME:_____     SBI #:_____

LOCATION:_____     CASE #:_____

DATE:_____     APPEAL DUE DATE:_____

APPEAL INFORMATION:

_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

_____
(GRIEVANT'S SIGNATURE)

FORM #585

## MEDICAL GRIEVANCE FORM

FACILITY:_____     DATE:_____

GRIEVANT'S NAME:_____     SBI #:_____

CASE #:_____     TIME OF INCIDENT:_____

HOUSING UNIT:_____

☐   MEDICAL          ☐   MENTAL HEALTH          ☐   DENTAL

BRIEFLY STATE THE REASON FOR THIS GRIEVANCE. GIVE DATES AND NAMES OF OTHERS INVOLVED IN THE INCIDENT OR ANY WITNESSES.

_____
_____
_____
_____
_____
_____
_____
_____

GRIEVANT'S SIGNATURE:_____     DATE:_____

ACTION REQUESTED BY GRIEVANT:

_____
_____
_____
_____

GRIEVANT'S SIGNATURE:_____     DATE:_____

WAS AN INFORMAL RESOLUTION ACCEPTED?          _____(YES)          _____(NO)

(COMPLETE ONLY IF RESOLVED PRIOR TO HEARING)

GRIEVANTS'S SIGNATURE:_____     DATE:_____

IF UNRESOLVED, YOU ARE ENTITLED TO A HEARING BY THE MEDICAL GRIEVANCE COMMITTEE.

cc: INSTITUTION FILE
    GRIEVANT

M.G.C. DECISION

GRIEVANT'S NAME: _____     SBI #: _____

CASE #: _____     HOUSING UNIT: _____

(Complaint and Requested Remedy must be completed by medical staff prior to MGC hearing)

COMPLAINT:
_____
_____
_____
_____

REQUESTED REMEDY:
_____
_____
_____
_____

ACTION:
_____
_____
_____
_____

PLAN:
_____
_____
_____
_____

|  | Uphold | Deny | Abstain |
|---|---|---|---|
| Medical Staff & Title _____ | ☐ | ☐ | ☐ |
| Medical Staff & Title _____ | ☐ | ☐ | ☐ |
| Medical Staff & Title _____ | ☐ | ☐ | ☐ |

I.G.C.: _____

M.G.C.: _____ Deny     _____ Uphold

Date: _____

Appeal Due: _____

| POLICY OF | POLICY NUMBER | PAGE NUMBER |
|---|---|---|
| DEPARTMENT OF CORRECTION | 4.4 | 1 of 10 |
| BUREAU OF PRISONS | RELATED ACA STANDARDS: 4-4284 | |
| CHAPTER: 4 Decision-Making | SUBJECT: Inmate Grievance Policy | |
| APPROVED BY THE BUREAU CHIEF: | | |
| EFFECTIVE DATE: 4/27/15 | | |
| APPROVED FOR PUBLIC RELEASE: Yes | | |

**I. AUTHORITY**: DOC Policy 4.4

**II. PURPOSE**: To reduce tension in Bureau of Prisons (BOP) correctional facilities and to resolve grievances within the system. Every inmate will be provided a timely, effective means of having problems brought to the attention of those who can offer administrative remedies.

**III. APPLICABILITY**: This policy covers all BOP employees, volunteers, persons or organizations conducting business with the BOP; as well as, all inmates under BOP supervision or custody.

**IV. POLICY**: Inmates may submit written Grievances concerning conditions of their confinement and BOP policies or practices under the guidelines that follow. BOP does not tolerate any form of retaliation by inmates or staff for use of or participation in the grievance process. Such acts will be grounds for disciplinary action and possible criminal prosecution.

**V. DEFINITIONS**:

**Abandonment**: Failure by an inmate to comply with required timelines or attend required hearings. This grievance matter will be considered closed.

**Abuse**: A demonstrated pattern of filing grievances in a manner other than in good faith, such as filing clearly frivolous, repetitious, or knowingly false documents. Failing to follow grievance guidelines as set forth in this policy.

**Bureau Grievance Officer ("BGO")**: A BOP employee who monitors and coordinates the Inmate Grievance Policy and reviews the appeal of a Warden's decision prior to making a recommendation to the appropriate Bureau Chief.

**Bureau Level Subject Matter Expert ("BSME")**: Assigned Bureau-level staff who are familiar with a specialized area of operation within a facility, including facilities maintenance, food service, and records.

**Emergency Grievance**: A Grievance concerning matters which under regular policy time limits would subject the inmate to a substantial risk of personal, physical or psychological harm. An Emergency Grievance may be submitted as an appeal when the RGC recommends a restriction an inmate's ability to file grievances due to a finding of abuse.

| POLICY OF<br>DEPARTMENT OF CORRECTION<br>BUREAU OF PRISONS | POLICY NUMBER<br>4.4 | PAGE NUMBER<br>2 of 10 |
|---|---|---|
| SUBJECT: Inmate Grievance Policy | | |

**Grievance**:  A written complaint concerning the substance or application of a policy or practice, any act or omission attributable to staff, vendors, volunteers, or other inmates affecting an inmate and any condition or incident within the institution that affects the grievant.

**Inmate Grievance Chairperson ("IGC")**:  An institutional employee designated to administer inmate Grievances at a BOP facility.

**Local Subject Matter Expert ("SME")**:  Assigned institutional staff who is familiar with a specialized area of operation within a facility, including inmate healthcare services, facilities maintenance, food service, records, and inmate phone services.

**Subject Matter Expert Panel ("SME Panel")**:  An institutional committee representing facilities maintenance, food service and records.

- Maintenance- Maintenance Superintendent and one other designated Maintenance Officer
- Food Service- Food Service Director and one other designated Food Service Officer
- Records- Records Manager and one other designated Records staff member

**Outside Reviewer**:  An individual not associated with the Department of Correction, who hears appealed cases referred by the Bureau Chief.

**Released**:  Upon an inmate being released from custody a grievance may be closed.

**Reprisal**:  Any retaliatory action or threat of retaliatory action against inmates or staff based upon the use of, or participation in, the Grievance process.

**Resident Grievance Committee ("RGC")**:  An institutional committee comprised of staff and inmates that conducts Grievance hearings and makes recommendations to the facility Warden.

**Withdrawn:**  Upon written notice to the IGC, the inmate may request to have his grievance withdrawn.  This grievance matter will be considered closed.

**Warden**:  As used in this policy, Warden shall mean either a facility Warden or the Warden's designee.

## VI. PROCEDURE:

1.  Copies of the Inmate Grievance Policy and relevant forms shall be readily available to inmates in each facility.

| POLICY OF<br>DEPARTMENT OF CORRECTION<br>BUREAU OF PRISONS | POLICY NUMBER<br><br>4.4 | PAGE NUMBER<br><br>3 of 10 |
|---|---|---|
| SUBJECT: Inmate Grievance Policy | | |

2.   All inmates, regardless of physical condition, security or administrative status, are entitled to file Grievances in good faith.  Inmate complaints regarding policies and conditions must be within DOC jurisdiction.

3.   Policies that have their own formal appeal mechanisms are not grievable under this policy.  Specifically excluded are issues concerning inmate disciplinary sanctions (BOP Policy 4.2), classification (BOP Policy 3.3), and Parole Board decisions (BOP Policy 3.33 & 3.34).  Inmates must address appeals on these issues as directed in those policies.

4.   Inmates seeking appeal of court ordered sentencing, credit for time served, or other conflicts regarding sentencing order intent must address those issues directly with the sentencing judge.  The IGC will return the grievance with guidance to write the appropriate Court or Central Offender Records.

5.   Inmates and staff shall have access to periodic training on this policy, as circumstances dictate, or at the discretion of the facility Warden.

6.   Grievants are entitled to a meaningful and well-reasoned answer to the administrative remedy requested.  Relief may include adjustment to an objectionable condition of confinement, institutional procedure or practice, or restitution.

7.   Reprisals are prohibited.  Grievants or other participants in the Grievance process who experience Reprisals, and who wish to have them addressed, must write directly to the facility Warden.  Reprisal letters must describe in detail the alleged retaliatory actions, identify the names and roles of all staff or inmates involved, specify the location, dates and approximate times of all alleged retaliatory acts and identify witnesses to the alleged Reprisal.  The Warden shall investigate and respond in writing within 10 calendar days of receipt of the Reprisal letter.  The Warden's decision with respect to the Reprisal letter may be appealed to the Bureau Chief.

8.    No inmate or employee named or implicated in a Grievance shall participate in any capacity (other than as a witness) in the resolution process.  Grievances filed against the IGC or other decision-making individual or body shall be reviewed by the next higher authority.  The burden to show cause for removal lies with the inmate that filed the Grievance.

9.   All Grievances shall be kept separate from the inmate's master file.  Neither staff nor inmates shall have access to Grievance records except to the extent disclosure is compelled by court order or subpoena, or as may be necessary or appropriate for clerical processing, grievance resolution or compliance monitoring.

| POLICY OF DEPARTMENT OF CORRECTION BUREAU OF PRISONS | POLICY NUMBER 4.4 | PAGE NUMBER 4 of 10 |
|---|---|---|
| SUBJECT: Inmate Grievance Policy | | |

10. The maximum period between initial Grievance receipt and Bureau Chief final decision shall not exceed 180 calendar days. The maximum period between the submission of a Reprisal letter and Bureau Chief final decision shall not exceed 30 calendar days.

11. Inmates are prohibited from submitting more than one Grievance arising from the same incident. The submission of repetitive Grievances may be deemed Abuse of the Grievance process and could result in the loss of Grievance privileges and/or disciplinary action.

12. Inmates should only submit one issue per grievance form.

13. Grievances can be returned unprocessed if they contain vulgar/abusive or threatening language, were filed after the expiration of the applicable filing time period, are merely requests for information or services that may be obtained by other means, or are Grievances filed on behalf of another inmate.

14. If more than one inmate files a Grievance involving the same issue, the IGC will consolidate the staff investigations and RGC hearings into a single "group Grievance". The IGC will notify all individuals involved and make appropriate notes in all associated Grievance response forms.

15. If a full RGC panel cannot be convened as scheduled, the grievant may elect to have the Grievance heard by those committee members assembled or have the hearing rescheduled.

16. The IGC shall provide a copy of the response to each process step to the Grievant within 7 calendar days of IGC receipt.

17. The RGC shall be comprised of two inmates, elected by a majority vote from the housing unit, and two individuals designated by the facility Warden – one staff member responsible for inmate custody and one member of the treatment staff. Each RGC member has one vote; the IGC shall only vote to break a tie.

18. Two inmate and two alternate inmate RGC members shall be elected and shall serve for a term not to exceed one year. Vacancies shall be filled by special election. Staff RGC members shall serve at the discretion of the facility Warden.

19. The RGC shall discuss the merits of each Grievance and forward its recommendation to the facility Warden.

20. All investigative work must be completed and documented prior to the RGC hearing.

21. Inmates may withdraw a Grievance at any time by providing the IGC written notice.

| POLICY OF DEPARTMENT OF CORRECTION BUREAU OF PRISONS | POLICY NUMBER | PAGE NUMBER |
|---|---|---|
| | 4.4 | 5 of 10 |
| SUBJECT: Inmate Grievance Policy | | |

22.  The IGC shall process and maintain the Grievant's handwritten documents and the DACS grievance case records in a timely manner, in order to expedite clearance of any unresolved case.

23.  Remedies that are dependent on other state agencies or individuals or entities outside of the DOC may require additional time to be implemented. The IGC shall monitor progress of outside DOC entities.

24.  All Bureau Chiefs share responsibility for implementing this policy as it pertains to their specific functions and missions. This includes policy distribution to staff and inmates.

25.  The Bureau Chief shall coordinate with the Deputy Attorney General assigned to the DOC to provide initial grievance policy training and any periodic refresher training determined necessary.

VII.  **Non-Emergency Grievance Resolution Steps**:

A.  Step One (Informal Resolution)

The grievance process begins when an inmate manually completes Form #584 "Grievance Form" (copy attached). The grievant must submit the completed form to the IGC within 7 calendar days of the incident.

The IGC shall collect all Grievance Forms deposited into a secure inmate drop-box, accessible only to the IGC or IGC designee. The IGC will enter data from the forms into an automated grievance tracking system. The IGC is the hub of the case tracking mechanism. This system will electronically forward Grievances to the appropriate housing unit supervisor, area supervisor, or local SME staff within 7 calendar days of IGC receipt.

In the event that a Grievance filed relates to the conduct of any supervisor, the Grievance shall be electronically provided to that individual's immediate supervisor for review and investigation.

Employees, who receive electronic notifications of a Grievance, shall respond with the investigation outcome, in the automated tracking system, within 14 calendar days of receipt.

The IGC shall provide a copy of the "Step One" reply to the grievant within 7 calendar days of receipt.

The grievant's acceptance of the "Step One" reply to the remedy requested constitutes an informal Grievance resolution. The grievant shall indicate such acceptance by signing the Grievance Form #584 acceptance section, and returning it to the IGC within 7 calendar days of receipt of the reply.

| POLICY OF DEPARTMENT OF CORRECTION BUREAU OF PRISONS | POLICY NUMBER | PAGE NUMBER |
|---|---|---|
| | 4.4 | 6 of 10 |
| SUBJECT: Inmate Grievance Policy | | |

Informal resolution ends the Grievance process; the IGC shall electronically close the case and, as necessary monitor any resolution compliance issues.

A grievant wishing to reject an informal resolution must so indicate on the Grievance Form and return it to the IGC within 7 calendar days of receipt of the reply. The grievant's timely rejection of an informal resolution moves the case to Step Two. The IGC shall update the automated tracking system, electronically forward the case to the RGC or SME Panel, as appropriate, and schedule a grievance hearing.

The grievant's failure to return a signed acceptance or rejection of an informal resolution will be deemed an abandonment of the Grievance. In such instances, the IGC will electronically close the case after indicating "Abandonment" in the Grievance status code.

B.   Step Two (RGC / SME Panel Recommendation & Warden's Decision)

The IGC shall provide written notification to the grievant when a RGC or SME hearing will be held. The hearing notice shall be sent within 7 calendar days from IGC receipt of the rejected informal resolution.

The RGC or SME Panel shall convene a hearing within 30 calendar days to examine the issue grieved, review documents, hear testimony, and make a recommendation on the grievant's remedy requested. The grievant must attend the hearing. The grievant's failure to attend the hearing will be deemed an abandonment of the Grievance. In such instances, the IGC will electronically close the case after indicating "Abandoned" in the Grievance status

The hearing panel may ask questions relevant to the issue grieved. If the panel determines that further investigation is necessary or appropriate, the hearing may be adjourned by majority panel vote for an additional 14 calendar days. A hearing so adjourned shall be concluded and a recommendation issued no later than 44 days from the date of issuance of the hearing notice.

At the hearing, the grievant must provide all available supporting evidence to the hearing panel for consideration. Evidence not introduced at the hearing will not be eligible for insertion into the Grievance case at a later date.

RGC and SME Panel hearing recommendations shall be electronically documented in the automated grievance tracking system and forwarded to the IGC.

The IGC shall electronically forward the RGC / SME Panel recommendation to the facility Warden or appropriate Bureau-Level SME within 3 calendar days of receipt.

The facility Warden or Bureau-Level SME shall make a decision within 14 calendar days of receipt of a recommendation. Decision options include remanding the

| POLICY OF DEPARTMENT OF CORRECTION BUREAU OF PRISONS | POLICY NUMBER | PAGE NUMBER |
|---|---|---|
| | 4.4 | 7 of 10 |
| SUBJECT: Inmate Grievance Policy | | |

Grievance to the RGC/SME panel for additional investigation and upholding or denying the Grievance in whole or in part.

Wardens and Bureau-Level SME staff shall electronically forward their decisions to the IGC. The IGC shall notify the grievant in writing of the decision and supporting logic within 7 calendar days of receipt.

If the grievant accepts the decision, the Grievance shall be electronically closed by the IGC, and its status will be marked "Resolved". The IGC shall monitor any resolution compliance issues.

If the grievant rejects the decision, the grievant must submit a written "Grievance Appeal Form" (copy attached) to the IGC within 14 calendar days of decision receipt. Failure to appeal within this timeframe shall be deemed an acceptance of the decision.

Upon receipt of the completed Grievance Appeal Form, the IGC shall enter the appeal into the automated Grievance tracking system and electronically forward the case to the BGO within 7 calendar days of receipt.

C.    Step Three (Bureau Chief Decision & Case Resolution)

Within 7 calendar days following the receipt of the appeal, the BGO shall make an electronic recommendation to the Bureau Chief. Recommendation options include internal referral for more information, upholding or denying the Grievance in whole or in part and referral for Outside Review.

The Bureau Chief shall accept or reject the BGO recommendation. Except as provided below, the Bureau Chief shall document the decision in the automated system within 7 calendar days of receipt of the recommendation and electronically forward it to the IGC.

If the Bureau Chief opts for an Outside Review, he shall forward all Grievance materials to the reviewer within 3 calendar days. The referral shall be noted in the automated system. The Outside Reviewer must submit to the Bureau Chief a written recommendation with supporting logic within 7 calendar days of the referral.

The Bureau Chief shall accept or reject the Outside Reviewer recommendation or otherwise render a final decision on the appeal within 10 calendar days of receipt of the referral. The Bureau Chief shall document the decision in the automated system and electronically forward it to the IGC.

The Bureau Chief's decisions are final and not subject to further challenge. The Bureau Chief's electronic decision letter to the grievant shall include a statement that the grievant has fully exhausted all available administrative remedies.

| POLICY OF DEPARTMENT OF CORRECTION BUREAU OF PRISONS | POLICY NUMBER | PAGE NUMBER |
|---|---|---|
| | 4.4 | 8 of 10 |
| SUBJECT: Inmate Grievance Policy | | |

**VIII.   Emergency Grievance Resolution**:

The IGC shall expedite and forward Emergency Grievances to the facility Warden or BSME, who shall promptly determine if the grievance qualifies as an emergency under the policy definition.  If the case qualifies, the Warden or BSME shall immediately address or cause to be addressed any substantiated emergencies and shall promptly document in the automated system any such emergency and responsive action taken.

If the Warden or BSME determines that the case is not an emergency, the Grievance shall be electronically returned to the IGC for regular Grievance processing.  The IGC shall promptly notify the grievant of the decision.

If the grievant accepts the responsive action, the case shall be electronically closed by the IGC, and its status will indicate "Resolved".  The IGC shall monitor any resolution compliance issues.

If the grievant rejects the decision and responsive action, the grievant must submit a written "Grievance Appeal Form" (copy attached) to the IGC within 24 hours from receipt of decision to be forwarded to the Bureau Chief.  Failure to appeal within this timeframe shall be deemed as abandonment of the Emergency Grievance and/or the grievant's acceptance of the decision and responsive action.

Appeals involving Emergency Grievances shall be electronically forwarded to the Bureau Chief.  The Bureau Chief shall make a decision on the Emergency Grievance appeal within 72 hours, which shall be documented in the automated system.

**IX.   Inmate Abuse of Grievance Mechanism:**

Inmates shall not abuse the Grievance process by attempting to flood the process with excessive numbers of grievances or frivolous grievances. The determination as to whether an inmate's Grievance–related conduct amounts to abuse shall not be based solely on the quantity of Grievances filed by the inmate, or whether and to what extent any Grievances have been denied.  The issue of Abuse hinges on good faith, which shall be determined on a case-by-case basis.

An inmate who is suspected of abusing the Grievance process shall first be interviewed by the IGC concerning the factual basis and the rationale for the offending Grievances. The ramifications of a finding of Abuse shall be explained to the inmate, and the inmate shall be given an opportunity to withdraw any pending Grievances.  The interview, including any explanation provided for the Grievance, shall be documented in in the automated system (Step 1).

If the inmate fails to offer a valid justification for the Grievance(s) and fails to agree to withdraw the offending Grievance after consultation with the IGC, the inmate shall be referred by the IGC to the RGC for a determination of Abuse (Step 2).  The referral shall be documented in the automated system.  If the Grievance is deemed appropriate, it shall be handled through the normal Grievance process.

| POLICY OF DEPARTMENT OF CORRECTION BUREAU OF PRISONS | POLICY NUMBER | PAGE NUMBER |
|---|---|---|
| | 4.4 | 9 of 10 |
| SUBJECT: Inmate Grievance Policy | | |

The IGC shall provide written notification to the inmate that an Abuse hearing will be held. The RGC shall convene a hearing and issue recommendations. At the hearing, the RGC shall consider the Grievance, review documents, hear testimony and make a determination on the alleged abuse. The RGC may ask questions relevant to the issue grieved. A grievant's refusal or failure to provide complete and accurate answers may be considered evidence of Abuse. The grievant must attend the Abuse hearing. The grievant's failure to attend the Abuse hearing will be deemed as admission of Abuse.

The RGC shall also make a recommendation on restricting the inmate's ability to lodge future Grievances. Restrictions will limit the inmate to having up to six (6) active Grievances in the Grievance system at one time, not including emergency or medical Grievances. The inmate shall be placed on such restriction for a period of ninety (90) calendar days from the date of determination. This recommendation will be forwarded to the Warden for final approval.

In extreme cases where there exists Abuse of Emergency and Medical Grievances, the same process as listed above shall be followed with the consideration to exclude those particular types of Grievances.

An inmate may appeal the finding of Abuse and the restrictions in accordance with this policy by submitting an Emergency Grievance. An Emergency Grievance filed under this situation will be accepted by the Warden in the automated system as "Denied" so the IGC can indicate that it is an appeal to be forwarded to the Bureau Chief. The Bureau Chief shall make a decision on the Emergency Grievance appeal within 72 hours, which shall be documented in the automated system.

During any Grievance restriction period the IGC shall return to the inmate any Grievances lodged in excess of the authorized restricted amount. Grievances shall be returned in reverse order of receipt (i.e., the last ones submitted will be the first ones returned). The IGC shall document in the automated system the reason for returning the grievance as "Abuse" on the Returned or Unprocessed Grievance Checklist.

The decision to restrict an inmate's access to the Inmate Grievance Process shall be automatically forwarded to the BGO.

An inmate's ability to seek resolution of issues through informal processes shall not be restricted.

Nothing in this section precludes the inmate from being subject to the disciplinary process for Abuse of Privileges (2.01).

| POLICY OF<br>DEPARTMENT OF CORRECTION<br>BUREAU OF PRISONS | POLICY NUMBER<br><br>4.4 | PAGE NUMBER<br><br>10 of 10 |
|---|---|---|
| SUBJECT: Inmate Grievance Policy | | |

**X.     Medical Grievance Administration:**

Grievants shall manually complete and submit Form #585 "Medical Grievance" (copy attached) to the IGC for electronic entry into the automated tracking system.

The IGC is responsible for tracking medical grievances and facilitating the scheduling of grievance hearings at the institution level.

Specific instructions and reply time periods for medical grievances are addressed in The Bureau of Correctional Healthcare Services Policy A-11 "Grievance Mechanism" and are not a part of BOP non-medical grievance administration.

# EXHIBIT K

JTVCC James T. Vaughn Correctional Center                    Date: 07/21/2014
Smyrna Landing Road
SMYRNA DE, 19977
Phone No. 302-653-9261

## GRIEVANCE REPORT

### OFFENDER GRIEVANCE INFORMATION

| | | |
|---|---|---|
| Offender Name : DRUMGO, DESHAWN D | SBI# : 00365566 | Institution : JTVCC |
| Grievance # : 286173 | Grievance Date : 06/29/2014 | Category : Individual |
| Status : Unresolved | Resolution Status : | Resol. Date : |
| Grievance Type: Health Issue (Mental Health) | Incident Date : 06/29/2014 | Incident Time : |
| IGC : Dutton, Matthew | Housing at the time of Grievance : Bldg 18, Upper, Tier C, Cell 11, Single | |
| Grievance Loc : JTVCC -18 | Current Housing : Bldg 17, Lower, Tier A, Cell 4, Single | |

### OFFENDER GRIEVANCE DETAILS

Description of Complaint: Inmate Claims: To see mental health.  See entire grievance at top under scanner.

Remedy Requested :

### ADDITIONAL GRIEVANCE INFORMATION

Medical Grievance : YES                    Date Received by Medical Unit : 07/08/2014

Grievance Amount :

## INFORMAL RESOLUTION

### OFFENDER GRIEVANCE INFORMATION

| | | |
|---|---|---|
| Offender Name : DRUMGO, DESHAWN D | SBI# : 00365566 | Institution : JTVCC |
| Grievance # : 286173 | Grievance Date : 06/29/2014 | Category : Individual |
| Status : Unresolved | Resolution Status: | Inmate Status : |
| Grievance Type: Health Issue (Mental Health) | Incident Date : 06/29/2014 | Incident Time : |
| IGC : Dutton, Matthew | Housing at the time of Grievance : Bldg 18, Upper, Tier C, Cell 11, Single | |
| Grievance Loc : JTVCC -18 | Current Housing : Bldg 17, Lower, Tier A, Cell 4, Single | |

### INFORMAL RESOLUTION

Investigator Name : Sexton, Lezley                    Date of Report: 07/09/2014

Investigation Report :

Reason for Referring:

Investigator Name : Streets, Stefanie                    Date of Report: 07/09/2014

Investigation Report : On 07/09/2014 at approximately 1500 hrs, I (Stefanie Streets) mental health clinician met with Grievant (Drumgo, Dashawn) in the interview room in building 17 to address grievance #286173. Grievant informed writer that the incident took place sometime in June 2014 in building 23. He alleges that SGT. Kuschel (building SGT for bldg 23 on 4x12) was performing a pat search on him after chow was completed and he grabbed his penis and would not let go. The grievant stated, ?This is his M.O. he likes to grab johnsons.? The grievant informed writer that this has happened before and that the officer has been known to do this to other inmates. Grievant stated that numerous grievances have been filed against this officer and interventions have occurred with both LT. Schaeffer and LT. Wallace. He reported that he has not been able to call the ?PREA? hotline to report this incident but has spoken to Internal Affairs officer Stanley Baynard. He believes that there is a conflict of interest because nothing has been done in regards to corrective action against the officer. He began to have nightmares after the incident occurred in which he was being chained down

Page 1 of 5

Case 1:14-cv-01135-GMS  Document 40  Filed 11/23/15  Page 4 of 20 PageID #: 184

Smyrna Landing Road
SMYRNA DE, 19977
Phone No. 302-653-9261

# INFORMAL RESOLUTION

### OFFENDER GRIEVANCE INFORMATION

| | | |
|---|---|---|
| **Offender Name** : DRUMGO, DESHAWN D | **SBI#** : 00365566 | **Institution** : JTVCC |
| **Grievance #** : 286173 | **Grievance Date** : 06/29/2014 | **Category** : Individual |
| **Status** : Unresolved | **Resolution Status:** | **Inmate Status** : |
| **Grievance Type:** Health Issue (Mental Health) | **Incident Date** : 06/29/2014 | **Incident Time** : |
| **IGC** : Dutton, Matthew | **Housing at the time of Grievance** : Bldg 18, Upper, Tier C, Cell 11, Single | |
| **Grievance Loc** : JTVCC -18 | **Current Housing** : Bldg 17, Lower, Tier A, Cell 4, Single | |

**Investigator Name** : Streets, Stefanie                                                07/09/2014

by officers and sexually assaulted and he would wake up in a cold sweat. He stated he has placed a
sick call for each time he has had a dream, which has been about 4 different times. He refused to
sign off on a resolution and stated he is letting it go to Federal court. EOR.

**Reason for Referring:**

**Offender's Signature:** _____

**Date** : _____

**Witness (Officer)** : _____

EXHIBIT L

**WestlawNext**

**Donald M. Durkin Contracting, Inc. v. City of Newark**
United States District Court, D. Delaware.     September 22, 2006     Not Reported in F.Supp.2d     2006 WL 2724882     (Approx. 8 pages)

2006 WL 2724882
Only the Westlaw citation is currently available.
United States District Court,
D. Delaware.

DONALD M. DURKIN CONTRACTING, INC., Plaintiff
v.
CITY OF NEWARK, et al., Defendants
and
CITY OF NEWARK, et al., Third–Party Plaintiff
v.
DONALD M. DURKIN CONTRACTING, INC., and Federal Insurance
Company, Third–Party Defendants

No. CVIA 04–163 GMS.     |     Sept. 22, 2006.

**Attorneys and Law Firms**

Katharine L. Mayer, McCarter & English, LLP, James S. Green, Seitz, Van Ogtrop & Green, P.A., Wilmington, DE, Paul A. Logan, Powell, Trachtman, Logan, Carrle & Lombardo, P.C., King of Prussia, PA, David T. Bolger, pro hac vice, Patrick R. Kingsley, David M. Burkholder, Stradley, Ronon, Stevens & Young, LLP, Malvern, PA, for Plaintiff/Third–Party Defendants.

Paul Cottrell, Victoria Kathryn Petrone, Tighe, Cottrell & Logan, P.A., Wilmington, DE, for Defendants/Third–Party Plaintiffs.

*MEMORANDUM*

SLEET, J.

**I. INTRODUCTION**

*\*1* Presently before the court is Federal Insurance Company's motion for reconsideration (D.I.136) of the court's April 5, 2006 Order denying summary judgment. Also pending are several related motions in limine (D.I.163, 165, 190). For the reasons that follow, the court will grant the motion for reconsideration and will reconsider, *sua sponte*, related aspects of its September 2, 2004 Order that denied the plaintiff's motion for partial summary judgment. In doing so, the court grants summary judgment to Federal Insurance Company ("Federal"). Durkin's motion for partial summary judgment is granted in part and denied in part.

**II. FACTUAL BACKGROUND**

In the summer of 2000, the City of Newark ("City") contracted with URS Corporation ("URS") "for professional services related to the design and construction administration" of a water-supply reservoir. (D.I. 98 ¶ 1.) In April of 2002, the City also contracted with Durkin to perform the actual construction (hereinafter, the "Construction Contract"). Federal provided a Performance Bond (the "Bond") to the City in connection with work to be performed by Durkin. Everything was progressing more-or-less as expected until late 2003, when Durkin claims to have discovered defects in URS' design. From there, the relationship among the parties deteriorated, and the City eventually terminated Durkin by a letter dated February 3, 2004. In response, Durkin initiated the present action on March 16, 2004, naming as defendants the City, the mayor of Newark, certain members of the Newark City Council, and URS.

With respect to terminating Durkin, the City had contractual obligations under both the Bond and the Construction Contract. Under the terms of Section 15.2 of the Construction Contract between the City and Durkin, the City was required to provide Durkin and its surety, Federal, with seven days written notice of its intention to terminate Durkin for default. (D.I.122, Ex. A, Att. B, Sec. 15.2.) The Bond also set forth a series of procedural steps that the City had to take before Federal became obligated under the Performance Bond:

If there is no Owner Default, the Surety's obligation under the Bond shall arise after:

---

**SELECTED** TOPICS

On Motion or Summary Proceeding
Granting of Judgment

**Secondary Sources**

**APPENDIX IV GUIDANCE AND TECHNICAL ASSISTANCE MANUALS**
ADA Compliance Guide Appendix IV
...Under the Americans with Disabilities Act of 1990 (the "ADA"), an employer may ask disability-related questions and require medical examinations of an applicant only after the applicant has been given ...

**APPENDIX III: FEDERAL REGULATIONS**
Leave & Disability Coordination Hdbk Appendix III
...SUMMARY: This document provides the text of final regulations implementing the Family and Medical Leave Act of 1993 ("FMLA"DDD"), the law that provides eligible employees who work for covered employers...

**APPENDIX III -- JUDICIAL OPINIONS**
FDA Enforcement Man. Appendix III
...No. 74-215 Supreme Court of the United States 421 U.S. 658; 95 S. Ct. 1903 2d 489 Argued March 18-19, 1975 June 9, 1975 Mr. Chief Justice Burger delivered the opinion of the Court. We granted certiorar...

See More Secondary Sources

**Briefs**

**Brief Amici Curiae of the Equal Employment Advisory Council and the National School Boards Association in Support of the Petitioners**
1985 WL 670265
ANSONIA BOARD OF EDUCATION, et al., Petitioners, v. Ronald PHILBROOK, Respondent.
Supreme Court of the United States.
October 01, 1985
...FN* Counsel of Record The Equal Employment Advisory Council (EEAC) and the National School Boards Association (NSBA), with the written consent of all parties, respectfully submit this brief as amici cu...

**Final Brief of Appellee**
2001 WL 35992692
David A. GOLDMEIER, et al., Plaintiffs-Appellants, v. ALLSTATE INSURANCE COMPANY, Defendant-Appellee.
United States Court of Appeals, Sixth Circuit.
January 01, 2001
...Pursuant to 6th Cir.R.26.1, Appellee Allstate Insurance Company makes the following disclosure: 1. Is said party a subsidiary or affiliate of a publicly owned corporation? YES. If the answer is YES, li...

**Motion for Leave to File Brief Amici Curiae, and Brief Amici Curiae, of American Jewish Congress in Behalf of Itself, the American Civil Liberties Union, the Anti-Defamation League of B'nai B'rith and the Synagogue Council of America in Support of Respondent Philbrook**
1986 WL 728387
ANSONIA BOARD OF EDUCATION, et al., Petitioners, v. Ronald PHILBROOK, Respondent.
Supreme Court of the United States.
June 27, 1986

3.1 The Owner has notified the Contractor and the Surety ... that the Owner is considering declaring a Contractor Default and has requested and attempted to arrange a conference with the Contractor and the Surety to be held not later than fifteen days after receipt of such notice to discuss methods of performing the Construction Contract. If the Owner, the Contractor and the Surety agree, the Contractor shall be **allowed** a reasonable time to perform the Construction Contract, but such an agreement shall not waive the Owner's right, if any, subsequently to declare a Contractor Default; and

3.2 The Owner has declared a Contractor Default and formally terminated the Contractor's right to **complete** the contract. Such Contractor Default shall not be declared earlier than twenty days after the Contractor and the Surety have received notice as provided in Subparagraph 3.1....

**\*2** (D.I.122, Ex. A, Att.A).

The City claims that its letter of November 21, 2003 satisfied the seven-day notice requirement of Section 15.2 of the Construction Contract, as well as its obligation under Paragraph 3.1 of the Bond. The pertinent portion of that letter reads:

On behalf of the City of Newark, Delaware, I am writing to inform you that we are now considering declaring Donald M. Durkin Contracting, Inc. (DMD) in default of Newark Municipal Contract No. 02–02, pertaining to Construction of a Municipal Water Supply Reservoir. This precautionary letter has become necessary following DMD's failure to present a response to a means and methods for continuation of the project in accordance with our contract.

(D.I.122, Ex. A, Att. C.)

After the November 21st letter, Durkin, Federal and the City had a series of communications and interactions, which failed to resolve the ongoing disputes. Finally, the City voted to terminate Durkin. It is undisputed that the City terminated Durkin via a letter dated February 3, 2004, which stated:

Pursuant to the terms of the Contract and the Construction Performance Bond, the City of Newark declares a Contractor default and hereby formally terminates Donald M. Durkin Contracting, Inc.'s ("Durkin") right to **complete** the contract for the Construction of the City of Newark Water Supply Reservoir. The termination for cause due to Durkin's refusal to **complete** the Work. This Default has been declared after notifying both the Surety and Durkin and attending a conference with the Surety and Durkin as the Bond requires.

(D.I.122, Ex. A, Att.F.)

The City of Newark sent another letter to Durkin and Federal, on February 4, 2004, offering to extend the effective date of termination for an additional seven days.

**III. PROCEDURAL BACKGROUND**

Durkin moved for partial summary judgment on June 29, 2004 (D.I.36). On September 2, 2004, the court issued an Order (D.I.63) denying Durkin's motion for partial summary judgment (the "September 2nd Order"). On March 14, 2006, Federal filed a motion for summary judgment (D.I.122). On March 22–23, 2006, Ms. Carol Houck was deposed as the 30(b)(6) designee of the City. On March 24, 2006, the City filed its Answer to Federal's motion for summary judgment (D.I.126). Ms. Houck's deposition continued on March 28, 2006, and again on March 30, 2006. On March 31, 2006, Federal filed a Reply Brief to the City's March 24th Answer, relying for the first time on testimony from Ms. Houck's March 28th deposition. On April 5, 2006, the court issued a Memorandum and Order (D.I.132) denying Federal's motion for summary judgment (the "April 5th Order"). On April 17, 2006, Federal filed a motion for reconsideration (D.I.136) of the court's April 5th Order. Four days after Federal filed its motion for reconsideration, which expressly relies in part on the deposition testimony of Ms. Houck, Ms. Houck executed an **errata** sheet for her March 23rd deposition, "clarifying" statements she made under oath. On May 2, 2006, Ms. Houck executed an **errata** sheet for her March 28th deposition, further "clarifying" statements made under oath. On May 3, 2006, the City filed its Answer to Federal's Motion for Reconsideration, in which it relied upon the **errata** sheets to rebut Federal's position.

**\*3** In conjunction with the pretrial conference held before the court on September 5, 2006, Durkin and Federal filed motions in limine (D.I.163, 165, 190), which have helped to bring into sharper focus the issues raised in the previous motions for summary judgment.

...The American Jewish Congress, the American Civil Liberties Union, the Anti-Defamation League of B'nai B'rith and the Synagogue Council of America respectfully move for an order permitting them to file ...

See More Briefs

**Trial Court Documents**

**Moore v. University of Pittsburgh of the Com. System of Higher Educ.**

2005 WL 6718322
Moore v. University of Pittsburgh of the Com. System of Higher Educ.
United States District Court, W.D. Pennsylvania.
March 11, 2005

...Presently before the Court are the following Motions in Limine filed by Defendants in this matter: (1) DEFENDANTS' MOTION IN LIMINE TO EXCLUDE EVIDENCE OF THE SUNSERI LAWSUIT, with brief in support (Do...

**Patterson v. UPMC South Hills Health System Home Health, L.P.**

2003 WL 26074479
Patterson v. UPMC South Hills Health System Home Health, L.P.
United States District Court, W.D. Pennsylvania.
January 01, 2003

...In this civil action, plaintiff, Darla J. Patterson, seeks damages from defendant, UPMC South Hills Health System Home Health, L.P., for alleged race discrimination under 42 U.S.C. § 1981. Before the c...

**Ambrose v. Township of Robinson, PA**

2000 WL 35904886
Ambrose v. Township of Robinson, PA
United States District Court, W.D. Pennsylvania.
October 11, 2000

...AMBROSE, District Judge. Pending is Defendant's Motion for Summary Judgment as to Plaintiff's Fourteenth Amendment due process claims and his First Amendment claims pursuant to 42 U.S.C. §1983, as well...

See More Trial Court Documents

## IV. STANDARDS OF REVIEW

### A. Exclusion of Evidence

A court has broad discretion to admit or exclude evidence under the Federal Rules of Evidence. *Gumbs v. Int'l Harvester, Inc.*, 718 F.2d 88, 97 (3d Cir.1983). Motions to exclude evidence are committed to the court's discretion. *See In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 749 (3d Cir.1994) (on a motion to exclude proffered expert testimony, the trial court's inquiry is a flexible one, and its decision to admit or exclude expert testimony is reviewed under an "abuse of discretion" standard) (internal citations omitted). "[W]hen the district court's exclusionary evidentiary rulings with respect to scientific opinion testimony will result in a summary or directed judgment," the Court of Appeals will give those rulings "a 'hard look' to determine if a district court has abused its discretion in excluding evidence as unreliable." *Id.* at 750.

### B. Reconsideration

As a general rule, motions for reconsideration should be granted only "sparingly." *Tristrata Tech., Inc. v. ICN Pharms., Inc.*, 313 F.Supp.2d 405, 407 (D.Del.2004); *Karr v. Castle*, 768 F.Supp. 1087, 1090 (D.Del.1991). In this district, these types of motions are granted only if it appears that the court has patently misunderstood a party, has made a decision outside the adversarial issues presented by the parties, or has made an error not of reasoning, but of apprehension. *See, e.g., Shering Corp. v. Amgen, Inc.*, 25 F.Supp.2d 293, 295 (D.Del.1998); *Brambles USA, Inc. v. Blocker*, 735 F.Supp. 1239, 1240 (D.Del.1990) (citing *Above the Belt, Inc. v. Mel Bonhannan Roofing, Inc.*, 99 F.R.D. 99 (E.D.Va.1983)); *see also Karr*, 768 F.Supp. at 1090 (citing same). Motions for reconsideration should not be used to rehash arguments already briefed. *See Quaker Alloy Casting v. Gulfco Indus., Inc.*, 123 F.R.D. 282, 288 (N.D.Ill.1988) ("This Court's opinions are not intended as mere first drafts, subject to **revision** and reconsideration at a litigant's pleasure."). However, a court should reconsider a prior decision if it overlooked facts or precedent that reasonably would have altered the result. *Weissman v. Fruchtman*, 124 F.R.D. 559, 560 (S.D.N.Y.1989).

A court may grant a motion for reconsideration "if the moving party shows: (1) an intervening change in the controlling law; (2) the availability of new evidence that was not available when the court issued its order; or (3) the need to correct a manifest injustice." *Max's Seafood Café v. Quinteros*, 176 F.3d 669, 677 (3d Cir.1999).

### C. Summary Judgment

A grant of summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); *Biener v. Calio*, 361 F.3d 206 (3d Cir.2004). In reviewing summary judgment decisions, the Third Circuit views all evidence and draws all inferences in the light most favorable to the non-movant, affirming if no reasonable jury could find for the non-movant. *See Whiteland Woods, L.P. v. Twp. of West Whiteland*, 193 F.3d 177, 180 (3d Cir.1999). Thus, a trial court should only grant summary judgment if it determines that no "reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

*\*4* If a moving party has demonstrated the absence of a genuine issue of material fact—meaning that no reasonable jury could find in the nonmoving party's favor based on the record as a whole—concerns regarding the credibility of witnesses cannot defeat summary judgment. Instead, the nonmoving party must "present affirmative evidence in order to defeat a properly supported motion for summary judgment." *Liberty Lobby*, 477 U.S. at 256–57, 106 S.Ct. at 2514 (citation omitted). Thus, summary judgment is particularly appropriate where, notwithstanding issues of credibility, the nonmoving party has presented no evidence or inferences that would **allow** a reasonable mind to rule in its favor. In this situation, it may be said that the record as a whole points in one direction and the dispute **is not** "genuine." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), 475 U.S. 574, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986).

## V. DISCUSSION

### A. Motions In Limine

#### 1. Federal's Motion In Limine to Exclude the Deposition Errata Sheets of Carol Houck

Federal moves to exclude from admission into evidence at trial the **errata** sheets for the deposition of Ms. Carol Houck, the City's designated 30(b)(6) witness. Federal argues that the **errata** sheets provide a narrative substitute for Ms. Houck's sworn testimony and are, therefore, an attempt on the part of the City to create a sham fact issue. Specifically, Federal contends that Ms. Houck admitted in her March 28th deposition that the November 21st letter from the City to Durkin and Federal did not constitute notice under the terms of the Construction Contract. In her May 2nd **errata** sheet, Ms. Houck writes: "my reply on line 9 is incorrect if it suggests that the November 21, 2003 letter was not the seven-day notice letter."

In response, the City argues that Ms. Houck was deposed over four days "in a random and confusing manner...." In arguing that Ms. Houck's **errata** sheet clarifications were appropriate, the City quotes from Ms. Houck's **errata** sheet regarding her third day of testimony, in which she states:

> Once again during my deposition there were repeated references to various exhibits, out of order and with, I believe, the intent to confuse. I have now had the opportunity to review the deposition and further clarify that it is my belief that the letter of November 21, 2003 (Exhibit 20) served to ... provide notice of Default and termination to both the Surety (Bond) and Durkin (Contract) ...

(D.I. 137, Ex. A, Page 2.)

Corrections to deposition testimony are governed by **Rule 30**(e) of the Federal Rules of Civil Procedure. **Rule 30**(e) corrections are treated as affidavits. *Burns v. Board of County Comm'rs of Jackson County*, 330 F.3d 1275, 1282 (10th Cir.2003). In *Franks v. Nimmo*, the Tenth Circuit set forth a test for analyzing whether a party's affidavit constitutes an attempt to create sham issues of fact. 796 F.2d 1230 (10th Cir.1986)). Factors relevant to the existence of a sham fact issue include whether the affiant was cross-examined during her earlier testimony, whether the affiant had access to the pertinent evidence at the time of her earlier testimony or whether the affidavit was based on newly discovered evidence, and whether the earlier testimony reflects confusion which the affidavit attempts to explain. *Franks*, 796 F.2d at 1237 (citing *Camfield Tires, Inc. v. Michelin Tire Corp.*, 719 F.2d 1361, 1364–65 (8th Cir.1983); *Perma Research & Dev. Co. v. The Singer Co.*, 410 F.2d 572, 578 (2d Cir.1969)).

**\*5** Here, Ms. Houck's earlier testimony occurred during a deposition, at which counsel for both the City and Federal were present and able to question the witness. Ms. Houck was not just a fact witness testifying on her personal knowledge; she was also the City's 30(b)(6) designee, and as such, had an affirmative obligation to be prepared on the noticed topics so that she could give **complete**, knowledgeable, and binding answers on behalf of the party. *See Ierardi v. Lorillard, Inc.*, Civ. A No. 90–7049, 1991 WL 158911, at \*1 (E.D.Pa. Aug.3, 1991). Ms. Houck's corrections were not based on new evidence, but concerned documents and actions about which she was obviously well acquainted. In her May 2nd **errata** sheet, Ms. Houck does take issue with the manner in which she was deposed and states that she felt that counsel intended to confuse her. Notably, however, she stops short of saying she was in fact confused. Instead, Ms. Houck, after further review of her testimony, "clarifies" her answers by providing a substitute narrative for an appreciable portion of her deposition. The court can find no indication of confusion in the deposition transcript. In addition, it does not appear that Ms. Houck's attorney recognized any either. There is nothing in the record that suggests any attempt to rehabilitate Ms. Houck during, or immediately after the deposition, or otherwise clarify her statements until after Federal filed its motion for reconsideration.[1] Moreover, not only do Ms. Houck's **errata** sheet "clarifications" alter her answers on key issues in the case, they posit alternative theories and defenses that the City now appears to be preparing to advance at trial—an issue that the court will address below in a related motion in limine.

The court recognizes that Fed.R.Civ.P. 30(e) **allows** a deponent to make changes to deposition testimony in form or substance. Nevertheless, the court finds that Ms. Houck's **errata** sheets exceed the scope of the type of **revisions** contemplated by the Rule and serve only to improperly alter what was testified under oath. As has been aptly acknowledged by the Tenth Circuit, a deposition **is not** a take home exam. *See Garcia v. Pueblo Country Club*, 299 F.3d 1233, 1242 (10th Cir.2002) (quoting *Greenway v. Int'l Paper Co.*, 144 F.R.D. 322, 325 (W.D.La.1992)). The **errata** sheet "clarifications" in this case are akin to a student who takes her in-class examination home, but submits new answers only after realizing a month later that the import of her original answers could possibly result in a failing grade. The court is troubled by the timing of Ms. Houck's **errata** sheets as well as their use in the City's responsive briefing on Federal's motion for reconsideration. Nor can

the court ignore the fact that Ms. Houck was the City's 30(b)(6) designee, intimately familiar with the facts and issues in this case. Accordingly, the court holds that the **errata** sheets constitute a sham fact issue under *Franks* and, as such, the **errata** sheets shall not be admitted as evidence at trial.

**2. Durkin's Motion Regarding the Judicial Admission of the City of Newark Providing Prior Written Notice of Intent to Terminate the Contract**

**\*6** A party's assertion of fact in a pleading is a judicial admission by which it normally is bound throughout the course of the proceeding. *Schott Motorcycle Supply, Inc. v. Am. Honda Motor Co., Inc.,* 976 F.2d 58, 61 (1st Cir.1992) (quoting *Bellefonte Re Insurance Co. v. Argonaut Insurance Co.,* 757 F.2d 523, 528 (2d Cir.1985)). If factual matters in issue have been judicially admitted, they are binding on the tendering party. *See, e.g., Parilla v. IAP Worldwide Services, VI, Inc.,* 368 F.3d 269, 275 (3d Cir.2004) (internal citations omitted). An admission in a pleading is a judicial admission, which is binding on the litigant. *See, e.g., Consol. Rail Corp. v. Providence & Worcester Co.,* 540 F.Supp. 1210, 1220 n. 12 (D.Del.1982) (citing *Glannone v. United States Steel Corp.,* 238 F.2d 544, 547 (3d Cir.1956)).

With this principle in mind, Durkin moves in limine to preclude the City from arguing or attempting to present any evidence that controverts the City's prior contentions in pleadings that its November 21, 2003 letter from Carl Luft to Durkin and Federal represented the required seven-day written notice to Durkin of the City's intention to terminate the Construction Contract. Durkin contends that the City has maintained throughout this litigation that the November 21st letter gave written notice of its intent to terminate Durkin as required by the Construction Contract. Durkin points to the City's Answer, Counterclaim, and responsive briefs to the following motions: Durkin's Motion for Declaratory Judgment, Durkin's Motion for Partial Summary Judgment, and Federal's Motion for Summary Judgment, as examples of this affirmative representation. The City does not dispute this contention. Durkin contends that this consistently pled position is a judicial admission to which the City must be held. The court agrees.

In response to Durkin's motion, the City states: "It is uncontested that Newark's position is that its November 21, 2003 letter provided the requisite seven-day notice required by the Construction Contract termination provision." As to why this consistently pled assertion would not be a judicial admission, the City suggests that the doctrine of judicial admission conflicts with Rule 8(e)(2) of the Federal Rules of Civil Procedure. The City argues that Rule 8(e)(2) **allows** a party to set forth inconsistent, alternative and hypothetical pleadings. The City, however, did not **plead** the alternative defense it now seeks to be permitted to argue at trial. Additionally, in the City's Counterclaim, it admits that its November 21st letter constituted written notice of its intent to terminate Durkin. (D.I. 7, Counterclaim ¶ 19.)

Although the City pleads that it "further offered to suspend Durkin's termination if it would, in writing, agree to **complete** construction of the reservoir according to the design," (D.I. 7, Counterclaim ¶ 21), the court can not find an averment by the City that sets forth the contention that the letter dated February 4, 2004, could also satisfy the notice provision of Section 15 of the Construction Contract. Further, the City's reference to a suspension of Durkin's termination in its Counterclaim was not made in the context of an alternative or hypothetical pleading. *See Schott Motorcycle Supply,* 976 F.2d at 61 (citing 5 Wright & Miller, *Federal Practice and Procedure* § 1282 at 525 (2d ed.1990) (generally an alternative claim is drafted in the form of "either-or" and a hypothetical claim is in the form of "if-then")).

**\*7** It would be patently unfair and judicially inefficient to **allow** the City's defense to be a moving target, after the parties and the Court have relied upon the City's admissions. *See Soo Line R. Co. v. St. Louis Southwestern Ry. Co.,* 125 F.3d 481, 483 (7th Cir.1997) (holding that at summary judgment "judicial efficiency demands that a party not be **allowed** to controvert what it has already unequivocally told a court by the most formal and considered means possible."); *Keller v. U.S.,* 58 F.3d 1194, 1198 n. 8 (7th Cir.1995) ("Judicial admissions are formal concessions in the pleadings, or stipulations by a party or its counsel, that are binding upon the party making them. They may not be controverted at trial or on appeal. Indeed, they are 'not evidence at all but rather have the effect of withdrawing a fact from contention." ' (citations omitted)).

The notice requirement of the Construction Contract is one of the central issues in this case, and as a factual matter now judicially admitted by the City, it is binding. The court will, therefore, preclude the City from arguing or presenting evidence at trial that any other writing constituted the seven-day notice required by the Construction Contract.[2]

Donald M. Durkin Contracting, Inc. v. City of Newark, Not Reported in... Page 33 of 8

## B. Motion for Reconsideration

Recognizing that motions for reconsideration are granted only sparingly, the court finds that Federal's motion presents one of those rare occasions. Because Ms. Houck's deposition had not commenced before Federal filed its opening brief in support of its motion for summary judgment, the substance of Ms. Houck's testimony was first introduced in Federal's reply brief. Since the City did not have an opportunity to respond to the use of Ms. Houck's deposition in Federal's reply brief, the court properly disregarded the deposition testimony in its initial consideration of Federal's motion for summary judgment. Accordingly, the court believes it appropriate to reconsider its April 5th Order, now that the issue has been fully briefed with all parties having the opportunity to address the import of Ms. Houck's deposition testimony. *See Chase Manhattan Bank v. Iridium Africa Corp.,* No. Civ. A. 00 –564 JJF, 2004 WL 1588295, at *1 (D.Del. July 08, 2004) ("[A] court should reconsider a prior decision if it overlooked facts or precedent that reasonably would have altered the result."); *see also Pell v. E.I. Dupont de Nemours & Co. Inc.,* 231 F.R.D. 186, 189 (D.Del.2005) (granting motion for reconsideration where evidence was not addressed in the parties' opening and answering briefs). The court's April 5th Order was premised, in part, on what appeared to be a factual dispute as to whether the City satisfied the provision of the Construction Contract that required the City to give notice of its intent to terminate the contract. That appearance of a factual dispute dissipates when considering the deposition testimony of the City's 30(b)(6) designee, along with the court's rulings on the motions in limine, and the pleadings.

**\*8** In addition, the court's September 2nd Order was premised, in part, on the conclusion that a genuine issue of material fact existed with respect to satisfaction of the seven-day notice requirement in the Construction Contract. Given the court's holding above concerning the Houck deposition, the court believes it appropriate to reconsider its September 2nd Order, *sua sponte.* The September 2nd Order was issued over a year prior to the April 5th Order, on similar grounds, and without the consideration of the deposition testimony of the City's 30 (b)(6) witness.

## C. Motion for Summary Judgment on the Notice of Termination Issue

The court concludes that, given the City's admission as to the date of the notice of termination, there is no evidentiary basis upon which a reasonable jury could find in favor of the City. Moreover, the City's own 30(b)(6) witness admitted that the November 21st letter was not the required seven-day notice to Durkin and Federal, of the City's intent to terminate.

The court **is not** persuaded by the City's argument that Ms. Houck's deposition testimony taken together with her **errata** sheets presents evidence of a genuine issue of material fact that should preclude summary judgment. Instead, the court is guided by the Tenth Circuit's reasoning in *Franks.* The Court of Appeals in *Franks* stated, "that the utility of summary judgment as a procedure for screening out sham fact issues would be greatly undermined if a party could create an issue of fact merely by submitting an affidavit contradicting his own prior testimony." *Franks,* 796 F.2d at 1237 (citing *Camfield Tires,* 719 F.2d at 1365).

The plain language of the Construction Contract, the Bond and the November 21st letter make clear that, even absent the sworn deposition testimony of Ms. Houck, a reasonable jury could not find in favor of the non-movant City. It appears that the City attempted to follow the conditions of the Bond almost to the letter, but ignored a critical requirement imposed by the Construction Contract. That requirement included an additional procedural step prior to termination that the Bond did not; that is, seven-day notice to Durkin and Federal of its intent to terminate. As Federal and Durkin separately point out in their briefs, the November 21st letter neither formally declares Durkin in default, nor does it contain the word "terminate." Indeed, it even states that it is a "precautionary letter."

The City argues that the November 21st letter simultaneously satisfied the conditions of the Bond and the conditions of the Construction Contract. Putting aside the fact that the language of the November 21st letter is deficient on its face in declaring Durkin in default or providing a seven-day notice of termination, the City's position might be tenable if the parties to the two contracts were separate, non-overlapping and otherwise unaware of the obligations in both contracts. In this instance, however, it appears that Federal and Durkin were at all times aware of the obligations imposed in both the Construction Contract and the Bond. It is clear that the "considering declaring" provision of the Bond functions to initiate a conflict-resolution process that could potentially obviate a declaration of default. [3] Further, the parties proceeded to carry out these steps ostensibly to resolve the conflicts. For these reasons, it is unreasonable to suggest that the November 21st letter was notice under

Case 1:14-cv-01135-CFC Document 46-1 Filed 01/29/16 Page 67 of 68 PageID #: 3247

Donald M. Durkin Contracting, Inc. v. City of Newark et al, Not Reported in...

Paragraph 3.1 of the Bond, and at the same time, notice under Section 15.2 of the Construction Contract. The procedural requirements of Paragraph 3.1 are expressly before a declaration of default and the requirement of Section 15.2 of the Construction Contract must necessarily be a declaration of default or intent to terminate.

*9 Where the record, taken as a whole, could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Fed. Sav. & Loan, Inc. v. Krajl,* 968 F.2d 500, 503 (5th Cir.1992). On the pleadings and exhibits alone, the court holds that it seems unlikely that a reasonable jury could find for the City on the notice of termination issue. Where there may have been some appearance of a genuine issue on the pleadings before, the deposition testimony of the City's 30(b)(6) witness puts the issue to rest. Thus, taking into consideration the judicial admissions, the admissions of the City's 30(b)(6) witness, and the written record of pleadings and exhibits, the court concludes that a reasonable jury could not find for the non-movant City on the notice issue.

As such, the court will vacate its September 2nd Order[4] and April 5th Order, and will grant summary judgment to Federal and partial summary judgment to Durkin, with respect to the failure to provide seven-day notice to terminate as required by the Construction Contract.

**VI. CONCLUSION**
For the aforementioned reasons, the court will grant Federal's motion for summary judgment and will grant in part and deny in part Durkin's motion for partial summary judgment on the notice of termination issue.

*ORDER*
For the reasons stated in the court's Memorandum Opinion of this same date, IT IS HEREBY ORDERED that:

1. Federal's Motion for Reconsideration (D.I.136) is GRANTED.

2. Federal's *Motion in Limine* (D.I.163) to exclude the **errata** sheets of Ms. Carol Houck is GRANTED.

3. Federal's *Motion in Limine* (D.I.165) to exclude the "February 4th Letter" is GRANTED in part and DENIED in part.

4. Durkin's *Motion in Limine* (D.I.190) regarding the judicial admission of the City of Newark is GRANTED.

5. The Court's September 2, 2004 Order denying plaintiff's partial summary judgment (D.I.63) is VACATED.

6. The Court's April 5, 2006 Order denying summary judgment (D.I.132) is VACATED.

7. Federal's Motion for Summary Judgment (D.I.122) is GRANTED.

8. Durkin's Motion for Partial Summary Judgment (D.I.36) is GRANTED in part and DENIED in part.

**All Citations**

Not Reported in F.Supp.2d, 2006 WL 2724882

| Footnotes |
| --- |
| 1      In *Franks,* the Tenth Circuit also found noteworthy the timing of the disputed affidavit in concluding that the conflict between the earlier testimony and the affidavit raised only a sham issue. There, it was offered only after summary judgment had been granted against the party offering the conflicting affidavit. *Franks,* 796 F.2d at 1237. |
| 2      Federal also moves in limine to exclude the February 4th letter and any reference thereto (D.I.165). Federal's argument appears to be most concerned with the possibility that the City may try to use the February 4th letter as alternative proof that the City provided Durkin with a seven-day notice required by the Construction Contract, in the event that the November 21st letter is deemed insufficient to constitute notice under the Construction Contract. For the reasons stated above, the City is limited to the judicial admission that the November 21st letter constituted notice under the Construction Contract. The |

Donald M. Durkin Contracting, Inc. v. City of Newark, Westlaw...    Page 3 of 8

court, therefore, need not preclude *any* reference to the February 4th letter at trial to assuage Federal's concern. Simply put, it would be impermissible for the City to argue, in the alternative, that the February 4th letter satisfies the notice requirement under the Construction Contract in light of its judicial admission; however, the Court reserves judgment as to whether the letter may be admissible for some other purpose.

3      This conclusion is supported by the last provision in paragraph 3.1: If the Owner, the Contractor and the Surety agree, the Contractor shall be **allowed** a reasonable time to perform the Construction Contract, but such an agreement shall not waive the Owner's right, if any, subsequent to declare a Contractor Default.

4      The City correctly notes in its Answer to Durkin's Motion for Partial Summary Judgment that Durkin also seeks summary judgment on the issue of whether Newark had actual cause to terminate the Construction Contract. The Court does not grant such relief in this Order. Partial summary judgment in favor of Durkin is limited to the allegation that the City did not satisfy the notice requirement of the Construction Contract before terminating Durkin. Summary judgment **is not**, however, granted as to the allegation that City lacked the proper legal and factual basis for terminating Durkin or, in the City's view, that Durkin failed to perform. That dispute **is not** appropriately resolved on summary judgment with this record.

**End of Document** © 2016 Thomson Reuters. No claim to original U.S. Government Works.

