EXHIBIT I

**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————

No. 16-3308

———————

DE SHAWN DRUMGO,
Appellant

v.

SGT WILLIAM KUSCHEL; C/O VAN GORDER; LT. WALLACE; STANLEY
BAYNARD; SGT AUSTIN; C/O INGREM; C/O LEVIN; C/O ABERNATHY; C/O
HUTCHINS; WARDEN JAMES T VAUGHN CORRECTIONAL CENTER; CAPT.
BURTON; COMMISSIONER COULE; C/O PAYSONS

———————

On Appeal from the United States District Court
for the District of Delaware
(D. Del. No. 1-14-cv-01135)
District Judge:  Honorable Gregory M. Sleet

———————

Submitted Pursuant to Third Circuit LAR 34.1(a)
March 15, 2017
Before:  RESTREPO, SCIRICA and FISHER, Circuit Judges

(Opinion filed: March 27, 2017)

———————

OPINION*

———————

PER CURIAM

———————

* This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not
constitute binding precedent.

De Shawn Drumgo appeals, pro se and in forma pauperis, the District Court's orders dismissing certain Defendants and granting summary judgment as to the remaining Defendants. For the following reasons, we will affirm in part, vacate in part, and remand.

In September 2014, Drumgo filed suit against ten James T. Vaughn Correctional Center (JTVCC) and Delaware Department of Corrections officers and employees under 42 U.S.C. § 1983, alleging violations of his First, Eighth, and Fourteenth Amendment rights. Specifically, Drumgo alleged that on May 29, 2014, he was sexually assaulted during a pat down after leaving the chow hall. Drumgo asserted that Officer Kuschel patted and groped his legs in an inappropriate sexual manner, then grabbed and squeezed his penis until the skin ruptured while other officers laughed and failed to intervene.

Drumgo claimed that he then filed a sick call slip, grievance form, and Prison Rape Elimination Act (PREA) complaint pursuant to the JTVCC Inmate Grievance Procedure. An investigator at JTVCC investigated the PREA claim, concluded that it lacked credible evidence, and recommended closure. A week after the incident, Drumgo was transferred within the facility to Maximum Housing Unit 21. He alleged that the electricity was turned off there and that the guards would not fix it as retaliation for his allegations. On September 8, 2014, Drumgo filed the present suit.

The District Court initially dismissed six claims under 28 U.S.C. § 1915(e)(2) and § 1915A(b): four because no direct or personal involvement was alleged, and two as

2

frivolous for failure to state constitutional violations.[1]  The remaining Defendants moved

for summary judgment, arguing, inter alia, that Drumgo did not exhaust all available

remedies prior to filing suit as required by statute.  In support, Defendants attached an

affidavit from Michael Little, a Department of Corrections employee, stating that he

conducted a search of the Delaware Automated Corrections System (DACS) grievance

database for the year prior to the May 2014 incident, which revealed over 150 inmate

grievances filed by Drumgo, but none concerning the May 2014 incident with Officer

Kuschel and the other Defendants. The affidavit did not list the exact date range used

during the search, nor did it state that the database was searched for entries after the

alleged incident.

     Drumgo opposed the summary judgment motion and submitted affidavits from

inmates who claim to have witnessed the pat down.  In addition, Drumgo relied on a copy

of an Inmate Grievance form describing the incident, although it bears no stamp

indicating that it was received and processed by prison staff, in contrast to similar forms

for other complaints.  See Dist. Ct. Rec. Doc. 3 at 21.  He also submitted a medical

---

[1] Drumgo did not address this order in his briefs, but we reviewed it and agree with the
District Court.  See Roman v. Jeffes, 904 F.2d 192, 194 (3d Cir. 1990).  Drumgo never
alleged that the supervisors named in his complaint had direct or personal involvement in
the incident, so these claims were frivolous.  See Rode v. Dellarciprete, 845 F.2d 1195,
1207 (3d Cir. 1988).  And Drumgo's allegation that a warden and correctional officer did
not adequately respond to his complaints is likewise insufficient to state a constitutional
violation.  See Durmer v. O'Carroll, 991 F.2d 64, 69 (3d Cir. 1993).

grievance form, filed in September 2014, that describes the incident at issue. See Dist.
Ct. Rec. Doc. 46, Exhibit K.

The District Court determined that Drumgo did not sufficiently corroborate his
claim that he filed a grievance report, and thus failed to raise any genuine issue of
material fact as to exhaustion of his administrative remedies. Accordingly, the District
Court entered summary judgment in favor of the Defendants. Drumgo timely appealed.

We have jurisdiction pursuant to 28 U.S.C. § 1291 and review de novo the District
Court's grant of summary judgment.[2] Blunt v. Lower Merion Sch. Dist., 767 F.3d 247,
265 (3d Cir. 2014). Summary judgment is appropriate if the movant demonstrates that no
genuine issue as to a material fact exists. Lamont v. New Jersey, 637 F.3d 177, 181 (3d
Cir. 2011). A genuine issue exists if a reasonable jury could return a verdict for the non-
moving party. Id. In considering an order entered on a motion for summary judgment,
"we view the underlying facts and all reasonable inferences therefrom in the light most
favorable to the party opposing the motion." Pa. Coal Ass'n v. Babbitt, 63 F.3d 231, 236
(3d Cir. 1995).

In their brief, Appellees concede that Drumgo did file a grievance against Officer
Kuschel, and they refrain from asking that we summarily affirm the District Court's order
as to Officer Kuschel. The District Court based its decision on Drumgo's failure to

---

[2] Because Drumgo filed no amended notice of appeal from the District Court's order
denying his motion for reconsideration, we review only the orders dismissing certain
defendants and granting the motion for summary judgment filed by the remaining
defendants. See Fed. R. App. P. 4(a)(4)(B)(ii).

exhaust all available administrative remedies before filing a § 1983 suit.  See 42 U.S.C. § 1997e(a); Williams v. Beard, 482 F.3d 637, 639 (3d Cir. 2007).  Failure to exhaust is an affirmative defense and the defendant must prove that the prisoner failed to exhaust each of his claims.  Small v. Camden County, 728 F.3d 265, 268-69 (3d Cir. 2013).

Here, Appellees' brief explains that a subsequent database search conducted by Michael Little showed that Drumgo did file a grievance against Officer Kuschel.  Due to the allegations of sexual misconduct, the grievance was docketed in a separate DACS database to preserve confidentiality.  So, the grievance was not discovered during the initial search described in the affidavit on which the District Court relied.  Appellees contend that the District Court's decision as to Drumgo's exhaustion of his grievances against Officer Kuschel was nonetheless correct based upon the information available to and known by them at the time of their original submission.  While that may be true, the District Court should be afforded the full extent of the record in considering the exhaustion question.  So, we will vacate the District Court's grant of summary judgment as to Officer Kuschel, and will remand for further consideration.

As to the remaining Defendants, summary judgment for failure to exhaust was proper.  The affidavits submitted both to the District Court and on appeal establish that Michael Little searched both DACS databases for grievances relating to the incident at issue and discovered none.  Drumgo came forward with nothing to contradict this report or otherwise establish a genuine dispute as to this fact.  See Lamont, 637 F.3d at 181.

Thus, these Defendants satisfied their burden and summary judgment was proper. <u>See</u> <u>Small</u>, 728 F.3d at 268-69.

For these reasons we will vacate the District Court's judgment as to Officer Kuschel only, and will remand for further consideration of this claim. In all other respects, we will affirm the District Court's judgment. Appellee's motion for leave to file a supplemental appendix is granted.

# EXHIBIT II

### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| DE SHAWN DRUMGO, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   C.A. No.  14-1135 GMS |
| | ) |
| SGT. WILLIAM KUSCHEL, et al., | ) |
| | ) |
| Defendant. | ) |

### DECLARATION OF WILLIAM KUSCHEL

| | |
|---|---|
| STATE OF DELAWARE | ) |
| | )  *ss* |
| COUNTY OF NEW CASTLE | ) |

Pursuant to 28 U.S.C. §1746, I, WILLIAM KUSCHEL, declare the following:

1.      I executed an Affidavit on January 28, 2016, which was subsequently attached as Exhibit A to the Defendants' First Motion for Summary Judgment filed in the above-captioned matter.  (D.I. 45 and 46).  A copy of same is attached hereto.

2.      The statements contained thereon remain true and correct as of the present date.

3.      I further declare that I have not been involved with or had any disciplinary matters filed against me since that Affidavit was executed.

I, Sgt. William Kuschel, declare under penalty of perjury under the law of the United States of America that the foregoing is true and correct.

Executed on this   20   day of September, 2017.

_William Muschel, Sgt._
Signature

_William Kuschel, Sgt._
Print Name

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

DE SHAWN DRUMGO,     )
             )
   Plaintiff,      )
             )
   v.         )  C.A. No.  14-1135 GMS
             )
SGT. WILLIAM KUSCHEL, et al.,  )
             )
   Defendants.    )

## AFFIDAVIT

STATE OF DELAWARE  )
          ) *ss*
COUNTY OF NEW CASTLE )

BE IT KNOWN this __28__ day of January, 2016, personally appeared before me, the

Subscriber, a Notary Public for the State and County aforesaid, WILLIAM KUSCHEL,

personally known by me to be such and who, after being duly sworn by me according to law, did

depose and say the following:

  1.  I am employed by the Delaware Department of Correction ("DDOC") and am

currently assigned to the James T. Vaughn Correctional Center ("JVTCC") facility located in

Smyrna, Delaware.

  2.  I have been employed by DDOC since September, 2002 and was initially

assigned as a Correctional Officer ("C/O") to JTVCC, and have remained at that facility since

my original assignment.

  3.  I was promoted to the rank of Sergeant in October, 2005.  In that capacity, my

current duties include, but are not limited to, building supervision which entails a variety of posts

or assignments.  I may be required to provide external security for the facility or the security of

the facility's gate house. As such, my responsibilities include security checks and inspections, primarily as frisk searches, on all personnel entering the facility. This includes both staff and visitors alike, irrespective of age or gender.

4.     The above-described frisk searches are performed in the same manner in which I was trained at the DDOC academy and is in fact the exact same search procedure that I employ within the facility since my initial date of employment. This includes all searches of inmates, including but not limited to the Plaintiff, De Shawn Drumgo, Sr. ("Plaintiff"). The procedure that I was trained in and have continuously employed in all circumstances since the inception of my employment with DDOC is designed to quickly, efficiently and effectively detect and intercept contraband.

5.     I have read and reviewed Plaintiff's allegations in his Complaint in which he contends that I "sexually assaulted" him while conducting the same frisk search of him on the date in question as I have described above and performed countless times on staff, inmates and members of the general public alike. To date, Plaintiff's Complaint is the only time in which I have been accused by anyone of improperly performing the frisk search or deviating from the normal manner of performing said search as I had been trained in.

6.     I categorically deny any and all allegations of wrongdoing as otherwise alleged by Plaintiff. More specifically, I categorically deny "sexually assaulting" him. I further deny that I either grabbed, squeezed or held onto Plaintiff's penis during the course of my frisk search of him. Indeed, I frisk searched several other inmates who also exited the MHU 24-B chow hall (Maximum Housing Unit) at the same chow on the same date in question and in the same exact manner as I used with Plaintiff and in which I had been trained. Not one of those other inmates complained about, filed a lawsuit or otherwise alleged that they were "sexually assaulted" by me.

7.      I further categorically deny that Plaintiff either complained about or filed a grievance alleging wrongful conduct as a result of the same frisk search procedure that I would have used during another alleged frisk search of Plaintiff supposedly occurring approximately eight months before the alleged incident made the basis of this lawsuit.

8.      In addition, I categorically deny Plaintiff's allegations that I was either called into the office of either Lieutenant Wallace or Lieutenant Schaffer to discuss alleged complaints by inmates as to the manner in which I conducted the frisk search.  Nor have I ever been disciplined in any manner, either in reference to such complaints or other alleged misconduct or unprofessional behavior or performance of my duties.

9.      As for Plaintiff's allegation that I "sexually assaulted" him, I not only deny same but point to the fact that an investigation of this allegation was conducted by DDOC staff in accordance with both Federal law and Departmental policy.  The investigation, known as PREA (Prison Rape Elimination Act) included, to my understanding, at least an interview of myself and Plaintiff.  It is my understanding that the investigation determined that there was no merit whatsoever to Plaintiff's allegations and the matter was closed without any disciplinary action taken against me.

10.     I am also aware of statements made by Plaintiff during his deposition alleging that an altercation occurred between myself and inmate Marvin Burroughs as a result of that inmate's displeasure with a similar frisk search I conducted on that inmate.  I categorically deny that such an altercation ever occurred.

11.     Further, I have no recollection of Plaintiff yelling or calling for the other staff members working the MHU 24-B chow hall at the same time and date as myself to provide him with assistance or to provide "protection" for him during my frisk search of Plaintiff.  In fact, I

do recall that at that time, the other staff members were occupied themselves in the performance of their own assignments or duties as well as performing similar frisk searches of other inmates exiting the chow hall or observing and supervising the inmates in the chow hall to insure that no institutional rules were violated, no contraband was passed from one inmate to another and to maintain the security and safety of the chow hall for the sake of staff and inmates alike.  At no time did the other officers such as Co-Defendants Vangorder, Ingram, Hutchins, or Abernathy laugh at Plaintiff or refuse/fail to "protect" him as there was absolutely no reason for them to take such action.

12.     I further state that contrary to Plaintiff's allegations, the leather gloves that I employ for all frisk searches on all individuals as noted earlier are utilized to provide safety for me and to alleviate any fears of being injured during the course of frisk searches.  More specifically, due to the large size of my hands, the latex gloves usually employed by staff members prove inadequate and unsafe for me as they often split or tear while I use them.  On one occasion, they tore during a frisk search, resulting in my hand being exposed to fecal matter on the clothes of the inmate being searched.  I have also seen and heard of other staff members being cut or stabbed by contraband hidden on the person of an inmate, again exposing them to possible infection and disease such as AIDS, Hepatitis C and other similar serious or deadly communicable diseases.  Lastly, my gloves enable me to make a more thorough search of the subject in my efforts to detect potential contraband.

13.     Finally, I note for the record that as a result of conducting my frisk searches in the same thorough fashion in which I was originally trained, it has enabled me to detect, intercept and foil several attempts to spread contraband throughout the facility, thereby potentially saving

staff and inmates alike from harm while further preserving order, security and maintenance of discipline in the facility.

_William J. Kuschel, Sgt._
WILLIAM KUSCHEL

**SWORN TO AND SUBSCRIBED** before me the day and year aforesaid.

Date: _11/28/16_

NOTARY PUBLIC

_Michael S. Little_
Print Name

My Commission
Expires: _TERM_



EXHIBIT III

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

DE SHAWN DRUMGO, SR.,                    )
                                          )
                Plaintiff,                )
                                          )
        v.                                )        C.A. No.  14-1135 GMS
                                          )
SGT. WILLIAM KUSCHEL,                     )
                                          )
                Defendant.                )

**DECLARATION OF MARC RICHMAN**

STATE OF DELAWARE          )
                           )  *ss*
COUNTY OF KENT             )

Pursuant to 28 U.S.C. §1746, I, Dr. MARC RICHMAN, declare the following:

1.      I am the Bureau Chief for the Bureau of Correctional Health Care Services ("BCHS") for the Delaware Department of Correction ("DDOC").  I have held this position since July, 2015 and my primary office is located in Dover, Delaware.

2.      I am a licensed Psychologist in Delaware and have been working for several State agencies within the State for approximately 24 years.  These positions include the DDOC, Child Mental Health, and Substance Abuse and Mental Health.

3.      As Bureau Chief of the BCHS, I oversee and my primary responsibilities include all medical, behavioral health (mental health and substance abuse), dental, and pharmacy services and care for inmates incarcerated in all State Level IV and Level V (10) facilities in total.

4.      As noted in an affidavit I previously executed in reference to this matter (a copy of which is attached hereto), I have reviewed Plaintiff De Shawn Drumgo's ("Plaintiff") mental healthcare file maintained by our behavioral/mental healthcare vendor, Behavioral Health

Connections, CSP ("Connections"). In particular, I have become familiar with the allegations lodged by the Plaintiff against Defendant William Kuschel ("Defendant") and the therapeutic treatment sought by and afforded to Plaintiff by Connections in relation to said allegations.

5.    My review and my observations derived therefrom remain unchanged from my original affidavit from March 2016. In so stating that, I acknowledge that I have sought and obtained a summarized update as to Plaintiff's treatment and purported ongoing mental health claims from the date of my original affidavit. That summary indicates that Plaintiff is currently classified as a BH-Level 3 (Behavioral Health) individual diagnosed with Adjustment Disorder and Anxiety. That diagnosis was noted during a psychiatric evaluation occurring on March 7, 2017. It should be noted that BH Level 3 translates to an individual having a mental health history but receiving only routine, basic treatment as the mental health issues involved are not considered at all serious.

6.    Moreover, the summary does not show any diagnosis of PTSD (as alleged by Plaintiff) being made following that relatively recent psychiatric evaluation. The clinician's summary also indicates Plaintiff declined (as he previously did and acknowledged in his earlier deposition testimony) pharmacotherapy interventions, relying solely on "talk therapy". In April 2017, the treating psychologist apparently recommended bi-weekly short-term therapy sessions with a clinician to determine the severity of Plaintiff's then current concerns which, based on the timing of a renewed desire for therapy, appeared to coincide with the tragic hostage incident of February 1, 2017 that took place in Plaintiff's then assigned housing unit. Utilization of an evidence based treatment such as Cognitive Therapy was recommended to Plaintiff. According to the medical records, Plaintiff Drumgo met with the re-assigned Mental Health Clinician on 06/06/2017; 06/13/2017; 06/21/2017 and 07/13/2017 after he refused to meet with his primary

2

Clinician on 05/25/2017 and 05/31/2017 respectively.   According to the note on 07/13/2017, Plaintiff indicated that he has learned to apply techniques to enhance thought process and minimize stress as evidenced by his decrease in need for mental health service as he expressed both verbally and by his significant improvement in mood, stability and over-all functionality.

      7.     Based on the foregoing, Plaintiff's current psychological condition is essentially no different than what my review and observations were in March 2016.  In fact, I would say that his condition is much improved and any allegations to the contrary are neither reflected in the relevant medical nor mental health records.

      I, Dr. Marc Richman, declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on the $\underline{21st}$ day of September, 2017.

_____
                        Signature

_____
                        Print Name

3

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE
STATE OF DELAWARE
COUNTY OF KENT

DE SHAWN DRUMGO,       )
                             )
        Plaintiff,       )
                             )
        v.,          )     C.A. No. 14-1135 GMS
                             )
SGT. WILLIAM KUSCHEL, et al.,  )
                             )
        Defendants.    )

## AFFIDAVIT

BE IT REMEMBERED this 21c day of March, 2016, personally appeared before me, the Subscriber, a Notary Public for the State and County aforesaid, DR. MARC RICHMAN, personally known by me to be such and who, after being duly sworn by me according to law, did depose and say the following:

1.    I am employed as the Bureau Chief of the Bureau of Correctional Healthcare Services for the Delaware Department of Correction ("DDOC"). I have held this position for approximately nine (9) months and in this role, maintain oversight of the statewide medical and behavioral health care services provided by DDOC to 11 statewide facilities and entire inmate population through several medical, pharmacy and behavioral health care vendors.

2.      I am a licensed clinical psychologist with a Ph.D. degree in Clinical and School psychology.  I have practiced in this field for approximately twenty-seven (27) years.

3.      In my current position, I have become familiar with the mental health treatment record and history of Mr. DeShawn Drumgo, Sr., the Plaintiff in the above-captioned matter ("Plaintiff").

4.      In my review of the synopsis by Behavioral Health Connections, CSP ("Connections"), the DDOC's behavioral healthcare provider, of Plaintiff's mental health history/record with Connections, I noted that the Plaintiff is not currently taking any medication for any mental health issues of which he has complained or to which he has alluded.  Nor have any such medications been prescribed for him at any time while he has utilized Connections' services.

5.      Additionally, I also noted in Connections' review that the Plaintiff's usage of Connections' services has been spotty and sporadic at best and that he has voluntarily removed himself from Connections' caseload roster on more than one occasion.  In fact, it appears from Connections' review of Plaintiff's record that he only recently (perhaps within the past two-three months) rejoined the active caseload.

6.      Finally, I note from Connections' review that the Plaintiff's mental health record/history does not indicate a diagnosis of Post-Traumatic Stress

Disorder ("PTSD") though I understand the Plaintiff has made such an allegation. To the best of my knowledge, information and belief, none of Connections' psychiatric providers (including therapists and counselors) have made such a diagnosis or indicated same to the Plaintiff at any time.   Though I understand a mental health clinician may have noted a diagnostic impression based on sessions with the Plaintiff, my review of Connections' findings indicates no actual diagnosis of PTSD has been made, suggested or reflected in the Plaintiff's mental health record/history.

Date: 2/21/16

MARC RICHMAN

**SWORN TO AND SUBSCRIBED** before me this _____ day of March 2016.

NOTARY PUBLIC

My Commission Expires: 8/27/17

(print name) Tammy L. Menard

EXHIBIT IV

**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

––––––––––––––

No. 16-2821

––––––––––––––

KENNETH MANN,
as parents and co plenary guardians of
the estate of SHELDON MANN, an
incapacitated person, and in their own right;
ROSE MANN, as parents and co plenary
guardians of the estate of SHELDON MANN,
an incapacitated person, and in their own right,
Appellants

v.

PALMERTON AREA SCHOOL DISTRICT;
CHRISTOPHER WALKOWIAK, individually and in his
official capacity as a football coach

––––––––

On Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. Civil No. 3-14-cv-00068)
District Judge: Hon. A. Richard Caputo

––––––––––––––

Argued April 27, 2017

––––––––––––––

Before: MCKEE, VANASKIE, and RENDELL, *Circuit Judges*

(Opinion Filed: September 21, 2017)

Howard J. Bashman, Esq.   [Argued]
Law Offices of Howard J. Bashman
2300 Computer Avenue
Suite G-22
Willow Grove, PA 19090

Larry E. Bendesky, Esq.
Adam J. Pantano, Esq.
Robert W. Zimmerman, Esq.
Saltz Mongeluzzi Barrett & Bendesky
1650 Market Street
One Liberty Place, 52nd Floor
Philadelphia, PA 19103

   *Counsel for Appellants Kenneth Mann and Rose Mann*


Thomas A. Specht, Esq.   [Argued]
Robin B. Snyder, Esq.
Marshall Dennehey Warner Coleman & Goggin
P.O. Box 3118
Scranton, PA 18505
   *Counsel for Appellees Palmerton Area School District and Christopher Walkowiak*

---

OPINION OF THE COURT

————————————————

VANASKIE, *Circuit Judge*

In November of 2011 Sheldon Mann, a football player for the Palmerton Area School District, experienced a hard hit during a practice session. While some players thought that Sheldon may have been exhibiting concussion-like symptoms, he was sent back into the practice session by his Coach, Appellee Chris Walkowiak. After being returned to practice, Sheldon suffered another violent collision and was removed from the practice field. He would later be diagnosed with a traumatic brain injury. In bringing a lawsuit against Palmerton Area and Walkowiak, Sheldon's parents asserted that by requiring Sheldon to continue to practice after sustaining the first substantial blow, Walkowiak had violated Sheldon's constitutional right to bodily integrity under a state-created danger theory of liability. Also, Palmerton Area, the Manns alleged, was accountable under *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978). The District Court ruled in favor of Walkowiak and Palmerton Area on summary judgment, finding that, while there was ample evidence to suggest that Walkowiak was culpable under a state-created danger theory of liability, a constitutional right to protection in the context presented here was not clearly established in 2011. Accordingly, the District Court granted Walkowiak qualified immunity and dismissed him from the lawsuit on that basis. As to Palmerton Area, the District Court found that the Manns had failed to present evidence sufficient to warrant a jury trial on the question of whether the school district had a custom or policy that caused a violation of Sheldon's constitutional rights. Accordingly, the District Court entered judgment in favor of Palmerton Area.

3

We agree with the District Court's conclusions pertaining to the claims against the football coach: Walkowiak's alleged conduct, if proven at trial, would be sufficient to support a jury verdict in favor of Mann on his state-created danger claim, but the right in question—to be free from deliberate exposure to a traumatic brain injury after exhibiting signs of a concussion in the context of a violent contact sport—was not clearly established in 2011. Accordingly, the District Court correctly ruled that Coach Walkowiak was entitled to qualified immunity. We also agree with the District Court that the Manns did not present sufficient evidence to warrant a jury trial on the *Monell* claim against Palmerton Area. We will therefore affirm the District Court's grant of summary judgment.

## I.

Sheldon Mann was a student at Palmerton Area High School and had participated in its football program starting in July of 2008. Beginning in 2006, Walkowiak was a team coach and in 2011 was promoted to Head Coach. After being named Head Coach, Walkowiak received concussion and safety training at DeSales University. Because of this training he was aware of the signs and symptoms of a concussion.

On November 1, 2011, Sheldon, then a 17 year-old senior, was participating in practice and sustained a hard hit to his upper body area while playing the outside linebacker position as part of the "scout" team against the varsity starting team.[1]  Walkowiak claims he did not see the hit, but did

---

[1]  The role of a "scout" team in football practice is to play the role of the opposing team for the school's next game, with the

observed Sheldon "rolling" his shoulder.   (JA 509.)
Walkowiak testified at his deposition that he asked Sheldon if
"he was all right," to which Sheldon replied, "I'm fine," and
Sheldon continued to participate in the practice session.[2] (*Id.*)

_____

starting team running plays against anticipated formation of the
opposing team.  In this case, Sheldon was playing against the
Palmerton Area's starting offensive team as they prepared for
their upcoming game against Northern Lehigh High School.

[2]  Walkowiak indicated that the first hit may have produced
something like a shoulder "stinger," which he acknowledged
can be "a symptom of [a concussion], depending on where you
were hit."  (JA 1592, 1599).  According to the University of
Rochester Medical Center online "Health Encyclopedia:"

> Stingers occur when the shoulder and head go in
> opposite directions, the head is moved quickly to
> one side, or the area above the collarbone is hit.
> The injury occurs when a spinal nerve in the neck
> is compressed as the head accelerates backward
> and the neck is forced toward the affected side.
> Stingers may also be caused when the head
> accelerates sideways, away from the shoulder,
> which overstretches the nerves in the neck and
> shoulder region.

University of Rochester Medical Center, Health Encyclopedia,
*Put a Stop to Nerve Injuries Called Stingers* (2017),
https://www.urmc.rochester.edu/encyclopedia/content.aspx?c
ontenttypeid=1&contentid=2817 (last visited Aug. 24, 2017).

In multiple depositions, Sheldon's teammates testified that they believed Sheldon was suffering from a concussion after this hit and were surprised that he was allowed to continue to practice. One teammate even testified that it was one of the "bigger hits" he had ever seen. (JA 1657.) Another teammate testified that after the first hit, Sheldon looked as though he was dizzy and was stumbling around the field, symptoms that this teammate believed to be associated with a concussion. And while not explicitly stating that they believed that Sheldon Mann was suffering from a concussion, other coaches testified that they were aware of the symptoms of a concussion and that standard procedure was to remove a student suffering from concussion-like symptoms from practice and have him seen by a trainer.

Approximately twenty plays after Walkowiak observed Sheldon rolling his shoulder, Sheldon sustained a second hard hit to the upper body area. Walkowiak walked over to Sheldon to ascertain his condition. Sheldon told Walkowiak that "it was the hardest hit he received in playing football." (JA 550). After this second hit, Sheldon was removed from the practice field. Practice ended about 10 minutes later, and Walkowiak then accompanied Sheldon to the trainer's room.

At the time of this incident, Palmerton Area had in place a series of policies and procedures outlined in its 2011-2012 Athletic Handbook. The Handbook required that any player suffering from injury or illness be excluded from participation in the sport until cleared by a physician, and explicitly stated that a student suspected to be injured must be removed from play and sent to the athletic trainer.

6

As a result of the violent hits Sheldon sustained on November 1, 2011, he suffered a traumatic brain injury and his parents have been appointed his guardians. The Manns brought this lawsuit, asserting that Palmerton Area and Walkowiak (together "Appellees") had deprived Sheldon of this constitutionally-protected right to bodily integrity. Specifically, they argued that Sheldon's constitutional rights were violated as a result of Walkowiak's exercise of authority in telling Sheldon to continue participating in football practice after sustaining a hit and exhibiting signs of a concussion. Plaintiffs also claimed that Sheldon's constitutional rights were violated as a result of Palmerton Area's failure to assure that injured student-athletes were medically cleared to resume participation in the sport, failure to enforce and enact proper concussion policies, and failure to train the coaches on a safety protocol for head injuries. The parties engaged in discovery, and on February 1, 2016, Appellees moved for summary judgment, arguing that there was insufficient evidence to establish a state-created danger claim against Walkowiak and a municipal liability claim against Palmerton Area. Walkowiak also asserted a right to qualified immunity. On June 2, 2016, the District Court granted summary judgment in favor of defendants Walkowiak and Palmerton Area. This appeal followed.

## II.

The District Court possessed subject–matter jurisdiction pursuant to 28 U.S.C. §§1331 and 1343. We exercise jurisdiction over this appeal pursuant to 28 U.S.C. §1291. Our review of an order granting summary judgment is plenary. *Curley v. Klem*, 298 F.3d 271, 276 (3d Cir. 2002). Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file,

together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Wright v. Corning*, 679 F.3d 101, 105 (3d Cir. 2012) (quoting *Orsatti v. N.J. State Police*, 71 F.3d 480, 482 (3d Cir. 1995)).

## III.

State actors sued in their individual capacity under Section 1983 are entitled to qualified immunity "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). When a qualified immunity defense is asserted, a court must determine (1) whether the facts alleged by the plaintiff make out a violation of a constitutional right, and (2) whether that right was clearly established at the time of the injury. *Yarris v. Cty. of Del.*, 465 F.3d 129, 140-41 (3d Cir. 2006) (internal citation omitted). In this case, the District Court determined that the first prong of the qualified immunity inquiry was satisfied: the Manns had presented sufficient evidence to warrant a jury trial on the question of whether Walkowiak had violated Sheldon's constitutional rights. It is to this part of the qualified immunity test that we first turn our attention.

## A.

The Manns' state-created danger claim derives from the Fourteenth Amendment Due Process Clause, which provides that "[n]o state shall . . . deprive any person of life, liberty, or property without due process of law[.]" U.S. Const. amend XIV, § 1. We have recognized a successful state-created danger claim when a plaintiff pleads that

8

(1) the harm ultimately caused [by the state actor's conduct] was foreseeable and fairly direct; (2) a state actor acted with a degree of culpability that shocks the conscience; (3) a relationship between the state and the plaintiff existed such that the plaintiff was a foreseeable victim of the defendant's acts, or a member of a discrete class of persons subjected to the potential harm brought about by the state's actions, as opposed to a member of the public in general; and (4) a state actor affirmatively used his or her authority in a way that created a danger to the citizen or that rendered the citizen more vulnerable to danger than had the state not acted at all.

*Bright v. Westmoreland Cty.*, 443 F.3d 276, 281 (3d Cir. 2006) (internal quotation marks and footnotes omitted).

The first element of a state-created danger claim requires plaintiffs to establish that the harm sustained as a result of the defendant's conduct was "foreseeable and fairly direct." *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 235 (3d Cir. 2008). More specifically, this "require[s] a plaintiff to allege an awareness on the part of the state actors that rises to [the] level of actual knowledge or an awareness of risk that is sufficiently concrete to put the actors on notice of the harm." *Id.* at 238.

In his deposition, Walkowiak testified that he was aware of the symptoms of a concussion and had been trained in how to identify one. Walkowiak also testified that he was trained to err on the side of caution when it came to removing players who may be suffering concussion-like symptoms.

After Sheldon experienced the first hit, Walkowiak admitted that Sheldon's hit could have been characterized as a "stinger" and that this could be a symptom of a concussion.  (JA 1592; 1599).

The District Court held that this evidence would be sufficient to support a jury finding that "Sheldon's injury was a 'foreseeable and fairly direct' harm" of being allowed to continue to practice after sustaining the first big hit.  *Mann v. Palmerton Area Sch. Dist.*, 189 F. Supp. 3d 467, 475 (M.D. Pa. 2016).  We agree.

The District Court also held that the Manns had satisfied the second element of the state-created danger test—that Walkowiak acted with a degree of culpability that shocked the conscience.  We have observed that "[t]he exact degree of wrongfulness necessary to reach the 'conscience-shocking' level depends upon the circumstances of a particular case." *Estate of Smith v. Marasco,* 430 F.3d 140, 153 (3d Cir. 2005) (*quoting Miller v. City of Philadelphia,* 174 F.3d 368, 375 (3d Cir. 1999)).  If the circumstances are highly pressurized, it is necessary to show intentional harm by the state actor; however, if the state actor has the benefit of deliberation, then all the plaintiff needs to show is deliberate indifference.   *Id.* Moreover, in cases "involving something less urgent than a 'split-second' decision but more urgent than an 'unhurried judgment,'" the relevant inquiry is whether the state actor "consciously disregarded a great risk of harm," with the possibility that "actual knowledge of the risk may not be necessary where the risk is 'obvious.'"  *Sanford v. Stiles,* 456 F.3d 298, 310 (3d Cir. 2006).

The District Court correctly concluded that there was no indication that this was a highly pressurized environment

for which a showing of intent to harm would be necessary. Instead, the Manns only needed to prove deliberate indifference to the safety of a player in the circumstances presented here to satisfy the conscience-shocking element of their claim. (JA 12).

In Walkowiak's deposition testimony, he stated that he observed Sheldon as exhibiting the signs of a possible "stinger," a term that he acknowledged is associated with a concussion. He also testified, however, that he assumed the hit was not a substantial one because he did not actually see it. Contradicting Walkowiak's testimony is the testimony of an assistant coach, who, although absent from practice the day that Sheldon was injured, stated that Walkowiak told him that Sheldon experienced two hard hits. Walkowiak's boss, Athletic Director Andrew Remsing, also testified that Walkowiak could be considered to have failed to follow school policy for injuries by allowing Sheldon to remain if he was suffering concussive symptoms. Finally, the Manns presented testimony through other players that after Sheldon was first hit, Walkowiak instructed him to continue practicing. Although Walkowiak disclaimed knowledge of the first big hit, the Manns adduced sufficient evidence to call this disclaimer into doubt. Thus, for the purposes of the summary judgment ruling, it was appropriate to infer that that Walkowiak was aware that Sheldon had sustained a substantial blow and exhibited signs consistent with having sustained a concussion. Under these circumstances, a jury could find that, by failing to remove Sheldon from play and requiring him to continue to practice, Walkowiak was deliberately indifferent to the risk posed by sustaining a second substantial blow to the head.

To establish the third element of a state-created danger claim the Manns were required to prove that "a

11

relationship between the state and [Sheldon] existed such that [Sheldon] was a foreseeable victim of the defendant's acts." *Sanford*, 456 F.3d at 304. This element was not challenged by Appellees. The bar for proving this element is not terribly high, as we have previously held that a relationship can exist where a plaintiff is a member of a group that is subject to potential harm brought about by the state's actions. *Philips v. Cty. of Allegheny*, 515 F.3d 224, 242 (3d Cir. 2008). It is clear that a student-athlete stands in such a relationship with the coaching staff.

The final element of a state-created danger claim requires a showing that Walkowiak affirmatively used his authority in a way that created a danger to Sheldon or rendered him more vulnerable to danger. *Bright*, 443 F.3d at 281. The parties dispute whether Walkowiak took an affirmative act that put Sheldon in danger or made him more vulnerable to risk, but we find the District Court again to be correct in assessing that a reasonable juror could find this element of Sheldon's claim was also satisfied. If a jury concluded that Walkowiak was aware of the first blow to Sheldon's head and observed signs of a concussion, the jury could conclude that Walkowiak used his authority in a way that rendered Sheldon more vulnerable to harm by sending him back into the practice session.

In summary, we hold that there exists a relationship between a student-athlete and coach at a state-sponsored school such that the coach may be held liable where the coach requires a player, showing signs of a concussion, to continue to be exposed to violent hits. Stated otherwise, we hold that an injured student-athlete participating in a contact sport has a constitutional right to be protected from further harm, and that a state actor violates this right when the injured student-athlete is required to be exposed to a risk of harm by continuing to

12

practice or compete.  We now turn to the difficult question of whether this right was clearly established in November of 2011.

**B.**

Clearly established law for purposes of qualified immunity means that

> [t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.  This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent.

*Wilson v. Layne*, 526 U.S. 603, 615 (1999).  In addressing the clearly established prong of the qualified immunity inquiry, we must define the right allegedly violated at the appropriate level of specificity.  *Sharp v. Johnson,* 669 F.3d 144, 159 (3d Cir. 2012) (internal quotations omitted).  As we explained in *Spady v. Bethlehem Area School District,* 800 F.3d 633, 638 (3d Cir. 2015), we must "frame the right at issue in a more particularized, and hence more relevant, sense, in light of the case's specific context, not as a broad general proposition." (Internal quotations omitted.)

In *Spady*, a child suffered "dry drowning" after participating in a mandatory swim class run by the gym teacher.  *Id.* at 635.  We granted qualified immunity to the gym teacher, concluding that a child did not have a clearly established right to dry-drowning intervention protocols while

13

participating in gym class. *Id.* at 641. In arriving at this conclusion, we observed that the dangers of dry drowning were not so well known and obvious that a swim teacher should be expected to take extra precautions to guard against this rare phenomenon. *Id.*

In this case, the specific context is a football player fully clothed in protective gear, including a helmet, who experiences a violent blow, shows signs of a concussion, and is required to continue to engage in the same activity that caused the first substantial hit. We are aware of no appellate case decided prior to November of 2011 that held that a coach violates the student's constitutional rights by requiring the student to continue to play in these circumstances.

Our conclusion in *Spady* rested on the fact that "courts that have found colorable constitutional violations in school-athletic settings did so where state actors engaged in patently egregious and intentional misconduct." 800 F.3d at 641. *Compare Neal ex rel. Neal v. Fulton Cty. Bd. of Educ.* 229 F.3d 1069, 1076 (11th Cir. 2000) (holding that a student athlete had made out "a violation of his right under the Fourteenth Amendment to be free from excessive corporal punishment," after being hit with a blunt object by his coach) *and Johnson v. Newburgh Enlarged Sch. Dist.,* 239 F.3d 246, 252 (2d Cir. 2001) (no qualified immunity where gym teacher picked up a student by his throat and rammed his head into bleachers and a fuse box); *with Davis v. Carter,* 555 F.3d 979, 984 (11th Cir. 2009) (no constitutional violation stemming from student-athlete's death after rigorous football practice). No case has been called to our attention where a state-created danger was established after a student-athlete was required to continue to compete after sustaining a substantial hit, the results of which were observed by the coach and could

14

potentially signal a head injury, yet where the student-athlete told the coach that he was fine to continue to play, all of which is the evidence in this case. And while not binding, we similarly held as recently as 2013 in a non-precedential opinion that a cheerleader who suffered a serious injury due to a coach's decision to try out a new stunt without proper protective matting in place, did not violate a clearly established right held by the athlete. *See Hinterberger v. Iroquois Sch. Dist.*, 548 F. App'x 50, 54 (3d Cir. 2013).

The Manns rely heavily on *L.R. v. School District of Philadelphia*, 836 F.3d 235 (3d Cir. 2016). That case presented the question of whether a kindergarten teacher who released a student to a stranger who then sexually abused the child was entitled to qualified immunity. *Id.* at 239-240. We reasoned that the teacher was not entitled to qualified immunity because the right in question—"an individual's right not to be removed from a safe environment and placed into one in which it is clear that harm is likely to occur, particularly when the individual may, due to youth or other factors, be especially vulnerable to the risk of harm"—was clearly established at the time of the incident. *Id.* at 249. The Manns maintain that this same right is at issue in the case at hand. And while *L.R.* dealt with an incident that occurred in January of 2013, we relied on precedent that predated November of 2011. Specifically, *L.R.* relied heavily on our 1996 decision in *Kneipp v. Tedder*, 95 F.3d 1199 (3d Cir. 1996), which involved a police officer abandoning a plainly inebriated woman on her walk home who then passed out and suffered a serious injury. *Id.* at 1203.

*Kneipp* and *L.R.* are not dispositive here. *L.R.* established liability based on the fact that the risk of harm to the child would be patently obvious to any adult in that situation. Allowing a kindergartener to leave the classroom

15

with a stranger plainly exposed the vulnerable kindergartener to a substantial risk of grievous harm. Similarly, *Kneipp* dealt with a similarly vulnerable woman who was so inebriated that she could not even stand or follow simple instructions. Not only did the police officer detain her and send her male companion away, but the officer himself then abandoned her so that she had to walk home alone. *Id.* at 1201-03. Again, the risk of harm in abandoning someone who is clearly exhibiting signs of a physical impairment like severe inebriation demonstrates such deliberate indifference to the unsafe situation created by the state actor that imposing liability on the state actor is appropriate.

By way of contrast, in November of 2011 it was not so plainly obvious that that requiring a student-athlete, fully clothed in protective gear, to continue to participate in practice after sustaining a violent hit and exhibiting concussion symptoms implicated the student athlete's constitutional rights. The touchstone of qualified immunity analysis is whether there was "sufficient precedent at the time of action, factually similar to the plaintiff's allegations, to put [the] defendant on notice that his or her conduct is constitutionally prohibited." *Mammaro v. New Jersey Div. of Child Prot. & Permanency*, 814 F.3d 164, 169 (3d Cir. 2016) (*quoting McLaughlin v. Watson*, 271 F.3d 566, 572 (3d Cir. 2001)). We look first to the Supreme Court's cases. Even if support is lacking there, a "robust consensus of cases of persuasive authority in the Court[s] of Appeals could clearly establish a right for purposes of qualified immunity." *L.R.*, 836 F.3d at 248 (*quoting Mammaro*, 814 F.3d at 169)). Here, no case from this Court or any of our sister Courts of Appeals, let alone a Supreme Court case, has applied the principles we elucidated in *L.R.* and *Kneipp* to the school athletic context. We therefore

16

agree with the District Court that the right at issue here was not clearly established in November of 2011.

"When properly applied, [qualified immunity] protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Ashcroft v. Al-Kidd,* 563 U.S. 731, 743 (2011) (*quoting Malley v. Briggs,* 475 U.S. 335, 341 (1986)). Given the state of the law in 2011, it cannot be said that Walkowiak was "plainly incompetent" in sending Sheldon in to continue to practice after he saw Sheldon rolling his shoulder and being told by Sheldon, "I'm fine." (JA 509). Nor is there any basis for concluding that he knowingly violated Sheldon's constitutional rights. Accordingly, we will affirm the District Court's qualified immunity ruling.

## IV.

Finally, we must address the Manns' *Monell* claim against Palmerton Area. Local governments, such as school districts, cannot be held liable under §1983 for the acts of their employees. Instead, local governments may be found liable under §1983 for "their own illegal acts." *Connick v. Thompson,* 563 U.S. 51, 60 (2011). A municipality is liable under §1983 when a plaintiff can demonstrate that the municipality itself, through the implementation of a municipal policy or custom, causes a constitutional violation.

The Manns argue that coaches were not adequately trained on concussion recognition and protection, and had they been, Sheldon may not have suffered his severe injury. Specifically, they argue that the school's generic handbook for dealing with injured student-athletes failed to provide a protocol for dealing specifically with concussions. They submit national news articles from 2011 that reported on the

17

risk of concussions in football as well as manuals from neighboring school districts that had implemented concussion policies as of November 2011.  They also rely on *Thomas v. Cumberland County*, 749 F.3d 217, 219 (3d Cir. 2014), in which we assessed the significance of an expert's report establishing the need for training corrections officers to address and avoid inmate–on–inmate violence.  We held that because the evidence showed that the municipality failed to train its employees to handle recurring acts of violence, the District Court should not have precluded the factual issues from going to a jury. *Id.* at 225-26.  Unlike *Thomas*, the Manns cite no evidence that would suggest deliberate indifference to a pattern of recurring injuries.  *See Berg v. County of Allegheny*, 219 F.3d 261, 276 (3d Cir. 2000) ("Failure to . . . train municipal employees can ordinarily be considered deliberate indifference only where the failure has caused a pattern of violations").  "Without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights." *Connick*, 563 U.S. at 62.

In this case there is no evidence of a pattern of recurring head injuries in the Palmerton Area football program.  Nor is there evidence that Walkowiak or any other member of the coaching staff deliberately exposed injured players to the continuing risk of harm that playing football poses.  In the context of the *Monell* claim, it is also significant that the Pennsylvania General Assembly did not pass legislation that mandated training for coaches to prevent concussions until November 9, 2011, and the legislation did not even go into effect until July of 2012. *See* Safety in Youth Sports Act, 24 Pa. Cons. Stat. §§ 5321–5323.  Under these circumstances

there is no basis for concluding that a policy or custom of Palmerton Area or its failure to provide more intense concussion training to its coaches caused a violation of Sheldon's constitutional rights.

## V.

For the foregoing reasons we will affirm the District Court's order, entered June 2, 2016, granting summary judgment in favor of Walkowiak and Palmerton Area.

19